UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
HIGHLAND CDO OPPORTUNITY MASTER FUND,
L.P.,

                    Plaintiff,

          - against -                          **MEMORANDUM AND ORDER**

CITIBANK, N.A., CITIGROUP GLOBAL MARKETS        12 Civ. 2827 (NRB)
INC., CITIGROUP GLOBAL MARKETS LIMITED,
and CITIGROUP FINANCIAL PRODUCTS INC.,

                    Defendants.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") brings this action asserting claims for breach of contract; breach of the implied covenant of good faith and fair dealing; violation of Article 9 of the New York Uniform Commercial Code (the "U.C.C."); and unjust enrichment, with an accompanying request for imposition of a constructive trust. In the motion before the Court, defendants Citibank, N.A. ("CBNA"), Citigroup Global Markets Inc. ("CGMI"), Citigroup Global Markets Limited ("CGML"), and Citigroup Financial Products Inc. ("CFPI") (together, the "Citi Parties") seek dismissal of CDO Fund's complaint pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.[1]   For the reasons set forth below, the Citi Parties' motion is granted in part and denied in part.

**BACKGROUND**[2]

## I.   Introduction

This action arises from a series of complex financing transactions that met their early demise in the credit crisis. In 2007 and 2008, CDO Fund and one or more of the Citi Parties (collectively, the "Parties") executed a number of lending and financing agreements.  Compl. ¶ 1.  Under one set of contracts, CDO Fund sold credit protection to CBNA as part of a secured credit default swap transaction (the "CDS Transaction").[3]   Id. ¶ 20.  Under a second set of contracts, CBNA and CFPI provided a secured financing (or lending) facility to CDO Fund (the "Facility").   Id. ¶ 21.  In connection with these transactions, CDO Fund pledged collateral comprised primarily of interests in collateralized loan obligations ("CLOs"), collateralized debt obligations ("CDOs"), and other such investments.   Id. ¶¶ 1, 20-21.  In addition, CDO Fund agreed to post additional collateral

---

[1]     We heard oral argument on this motion on March 18, 2013.  References preceded by "Tr." refer to the transcript of oral argument.

[2]     This background is derived from (i) the complaint ("Compl."), filed in the Supreme Court of the State of New York, County of New York, on April 5, 2012 and removed to this District on April 10, 2012 and (ii) the Declaration of LeRoy Haynes in Support of Defendants' Motion to Dismiss ("Haynes Decl."), filed June 26, 2012, and the exhibits annexed thereto.  To the extent the allegations in the complaint are well-pleaded, we take them as true for the purposes of this motion.  See S.E.C. v. Apuzzo, 689 F.3d 204, 207 (2d Cir. 2012).

[3]     CDO Fund entered into parallel transactions with CBNA and CGML.  Compl. ¶ 20.  For ease of reference, we discuss the CDS Transaction with CBNA only.

(or "margin") if the value of the existing collateral decreased relative to the Citi Parties' exposure. Id. ¶¶ 20-21.

The CDS Transaction and the Facility were unrelated at their inception. However, the Parties later linked these transactions through the Restated Credit Support Administrative Agreement (the "CSAA"), dated October 10, 2008. Id. ¶ 22. The CSAA served as a "master netting product" that governed the administration of credit support under the transactions and cross-collateralized their underlying contracts. Id. As relevant here, the CSAA authorized the Citi Parties to value the collateral underlying the transactions and to issue margin calls to the extent there were shortfalls. Id. ¶ 23.

The crux of CDO Fund's complaint is that the Citi Parties abused this authority to generate "quick cash" at CDO Fund's expense. Id. ¶ 5. According to the complaint, the Citi Parties "inexplicably and unreasonably" marked down the value of the collateral and employed "coercion and economic duress" to force CDO Fund to satisfy inflated margin calls. Id. ¶¶ 24, 27. After CDO Fund defaulted on the margin calls, the Citi Parties allegedly seized the collateral at "rock bottom prices" and engaged in "disingenuous efforts" to sell it. Id. ¶¶ 5-6. CDO Fund maintains that the Citi Parties intended to, and did, keep most of the collateral they seized. Id. ¶ 7. As the collateral steadily regained its value, the Citi Parties allegedly reaped

an "undeserved windfall" of approximately $200 million -- all at CDO Fund's expense.  Id.

## II.   **The Transactions and Their Underlying Contracts**

### A.   **The CDS Transaction**

CDO Fund and CBNA entered into the CDS Transaction in 2007. Haynes Decl. Ex. A.  The terms of the transaction were set forth in the following contracts (collectively, the "CDS Contracts"):

- the ISDA Master Agreement (together with the Schedule, the "CBNA ISDA"), dated January 12, 2007, between CBNA and CDO Fund;

- the ISDA Credit Support Annex (the "Credit Support Annex"), dated January 12, 2007, between CBNA and CDO Fund; and

- the Amended Confirmation, dated September 18, 2008, between CBNA and CDO Fund.

Id. ¶ 19(a); Haynes Decl. Exs. A, B, C.[4]

Under the CDS Contracts, CDO Fund sold credit protection to CBNA in relation to certain "Reference Obligation[s]" consisting of complex securities.[5]  Haynes Decl. Ex. C § 1.  As the credit protection seller, CDO Fund was required to make floating-rate

---

[4]    These agreements were governed by New York law.  See Haynes Decl. Ex. A § 13(a), Pt. 4(h).

[5]    As the Court of Appeals has explained, "[a] credit default swap ('CDS') is a financial derivative that allows counterparties to buy and sell financial protection for the creditworthiness" of reference obligations. Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt., LLC, 692 F.3d 42, 46 (2d Cir. 2012).  "A counterparty taking the position that the [reference obligations] would not experience a 'Credit Event' -- such as bankruptcy, default, restructuring, or failure to pay a defined obligation -- is said to be the 'protection seller,' similar to an insurance underwriter." Id.  Conversely, "[a] counterparty taking the position that the [reference obligations] would experience a Credit Event is the 'protection buyer,' similar to an individual purchasing insurance."  Id.

payments to CBNA whenever necessary to compensate for a decrease in the market value of any Reference Obligation.  Id. § 3.  In exchange, CDO Fund received periodic fixed-rate payments from CBNA during the life of the contract.  Id. § 2.

In connection with the CDS Contracts, CDO Fund pledged collateral amounting to $59 million in aggregate notional value. Compl. ¶ 20; see also Haynes Decl. Ex. B ¶ 2 (each Party providing "a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral"). Furthermore, CDO Fund agreed to post margin if the value of the existing collateral, as calculated by CBNA, decreased relative to CBNA's exposure.  Haynes Decl. Ex. B ¶ 3.  Pursuant to this arrangement, CBNA regularly calculated an "excess/deficit amount" for the CDS Transaction using "the market value of the collateral offset by agreed-upon margins, asset marks, and posted cash."  Compl. ¶ 20; see also Haynes Decl. Ex. B ¶¶ 3-4. Under the terms of the CDS Contracts, CBNA undertook to perform these calculations "in good faith and in a commercially reasonable manner."  Haynes Decl. Ex. B ¶ 11(d).  To the extent that CDO Fund disagreed with the Citi Parties' calculations, the Credit Support Annex provided for dispute resolution.  See id. Ex. B ¶ 5.

**B.    The Facility**

Independently of the CDS Transaction, CBNA and CFPI agreed to provide a financing facility (i.e., the Facility) to CDO Fund. Compl. ¶ 21.  The Facility was governed by the following contracts (together with their amendments, the "Facility Contracts," and, together with the CDS Contracts and the ISDA Master Agreement, dated January 12, 2007, between CGML and CDO Fund, the "Underlying Contracts"):

- the Third Amended and Restated Facility Letter, dated August 27, 2007, between CBNA and CFPI, on the one hand, and CDO Fund, on the other;

- the Third Amended and Restated Master Financing Agreement, dated August 27, 2007, between CBNA and CDO Fund;

- the Second Amended and Restated Master Financing Agreement, dated August 27, 2007, between CFPI and CDO Fund; and

- the Master Repurchase Agreement, dated July 24, 2007, between CGMI and CDO Fund.

Id. ¶ 19(c)–(f); Haynes Decl. Exs. D, E, F, G, H, I, J.[6]

Under the Facility Contracts, CBNA and CFPI permitted CDO Fund to draw cash loans up to a predetermined maximum amount. Compl. ¶ 21.  In exchange, CDO Fund agreed to make monthly interest payments on outstanding loans and to repay the

---

[6]    New York law governed each of these agreements.  See Haynes Decl. Ex. D ¶ 26; Ex. E § 5; Ex. F § 16.4; Ex. G § 5; Ex. H § 16.4; Ex. I § 5; Ex. J ¶ 16.

principal in full on the scheduled maturity date.  Haynes Decl.
Ex. D ¶ 5; Ex. F ¶ 3.6; Ex. H ¶ 3.6.

CDO Fund pledged certain assets, notionally valued at $213
million, as collateral against the Facility.  Compl. ¶ 21.  As
with the CDS Transaction, CDO Fund undertook to post margin when
the value of existing collateral, as calculated by CBNA and
CFPI, fell below specified levels in relation to outstanding
loans.  Haynes Decl. Ex. F ¶ 3.5; Ex. H ¶ 3.5.  Therefore, CBNA
and CFPI regularly calculated an "excess/deficit amount" using
"the market value of the pledged collateral offset by an agreed-
upon 50% haircut and loan and cash amounts."  Compl. ¶ 21.  Once
again, CBNA and CFPI undertook to perform these calculations in
"good faith."  Haynes Decl. Ex. F, at 5; Ex. H, at 5.

   **C.   The CSAA**

Due to the complexity of the CDS Transaction and the
Facility, the Parties executed a master agreement (i.e., the
CSAA) that unified the administration of credit support with
respect to the Underlying Contracts.  Id. ¶ 22; Haynes Decl. Ex.
K.  The CSAA designated one or more of the Citi Parties as
"Credit Support Administrator,"[7] see Haynes Decl. Ex. K, at 4
(defining "Credit Support Administrator"), to perform margin

---

[7]    The CSAA defined "Credit Support Administrator" as "the Citigroup
Entity," id. Ex. K, at 4, which the CSAA defined to include CBNA, CGMI, CFPI,
or CGML, see id. at 1.  The CSAA authorized "the Citigroup Entity that is
then the Credit Support Administrator" to "designate another Citigroup Entity
to become the Credit Support Administrator, such designation to take effect
immediately."  Id. at 4.

calculations under each Underlying Contract, Compl. ¶ 23; see also Haynes Decl. Ex. K § 2(a) (requiring the Credit Support Administrator to "determine the Exposure Mark-to-Market Amount and the Independent Amount, if any, for each Underlying Contract"). The CSAA required the Credit Support Administrator to perform margin calculations in accordance with the relevant provisions, if any, of each Underlying Contract. Compl. ¶ 23; see also Haynes Decl. Ex. K, at 4-5 (defining "Exposure Mark-to-Market Amount"). Where no such provisions existed, the CSAA authorized the Credit Support Administrator to exercise discretion in determining the appropriate margin. Id.

To reduce the number of margin transfers required under the Underlying Contracts, the CSAA permitted the Credit Support Administrator to net any margin calls arising on the same date. Compl. ¶ 23; see also Haynes Decl. Ex. K § 2(g) ("In the event that on any one day, [CDO Fund] and any Citigroup Entity would otherwise be required pursuant to one or more Contracts to Transfer Credit Support or payments to or among one another in the same currency or in the same type of non-cash asset, the Credit Support Administrator may, at its option, calculate the netting of any or all such Transfers so that fewer Transfers need be made."). If CDO Fund became "generally unable to pay its debts when due," the Citi Parties were entitled to declare a "Close-out Event," which permitted the Citi Parties to terminate

the CSAA and/or any of the Underlying Contracts and net the termination amounts.  See Haynes Decl. Ex. K §§ 1, 6(a), 6(b).

## III.  **The Allegations Underlying the Instant Dispute**

As alleged in the complaint, "[d]uring the credit crisis of 2008, there was substantial panic by investors in assets of the type that comprised the collateral" securing the CDS Transaction and the Facility.  Compl. ¶ 2.  Between September 30, 2008 and October 15, 2008, the Citi Parties marked down the assets securing the Facility by $47 million.[8]  Id. ¶ 24.  On or about October 17, 2008, the Citi Parties issued a margin call of $19 million, which CDO Fund initially failed to satisfy.  Id. ¶ 24.  Accordingly, on or about October 20, 2008, the Citi Parties notified CDO Fund that they were entitled to declare a "Close-out Event" under the CSAA.  Id.

CDO Fund maintains that the Citi Parties' mark-downs were "unreasonabl[e]," because "nothing had changed in the economics of the underlying assets."  Id.  CDO Fund claims that it sought "justification" for the Citi Parties' actions -- "specifically requesting back-up or support for [the] dramatic mark-downs and corresponding margin call" -- but received none.  Id. ¶ 25.  Nevertheless, on or about October 23, 2008, CDO Fund posted

---

[8]     Specifically, CDO Fund alleges that the Citi Parties marked down the assets "from $85 million, on September 30, 2008, to $38 million, on October 15, 2008."  Compl. ¶ 24.

"additional 'free collateral' with a market value of just over $20 million." Id. ¶ 26.

CDO Fund alleges that, over the course of the following month, the Citi Parties continued to issue "unreasonabl[e]" margin calls without justifying their mark-downs. Id. ¶ 28. Once again, CDO Fund satisfied the Citi Parties' requests: on November 25, 2008, CDO Fund agreed by written contract to pay off the Facility by December 1, 2008 (the "November 2008 Agreement"), at which time the Facility would terminate, and the collateral securing the Facility would collateralize the surviving CDS Transaction. Id. ¶ 29; see also Haynes Decl. Ex. L. On December 2, 2008, the collateral thus shifted. Id. ¶ 31.

However, the margin calls did not cease. In early December 2008, the Citi Parties allegedly "mark[ed] down the original Facility collateral to approximately $18 million (from $85 million just weeks earlier) and effectively mark[ed] down the CDS collateral to $0 (from $59 million weeks earlier)." Id. ¶ 32. As a result, the Citi Parties issued margin calls of $5.2 million on December 11, 2008, and approximately $20 million every business day thereafter.[9] Id. ¶¶ 32, 34-35.

CDO Fund alleges that, "during that time period, there was absolutely no reason for [the Citi Parties] to keep marking down

---

[9]    The Citi Parties allegedly issued the $20 million margin calls between December 12, 2008 and December 31, 2008. Id. ¶¶ 34-35. As before, the Citi Parties purportedly refused to provide "back-up or support" for their calculations. Id. ¶ 35.

assets," because "there was little trading" on the relevant asset types and "very little, if any, downward market movement." Id. ¶ 35. CDO Fund claims:

> [O]ther third-party marks for the specific assets comprising the free collateral, during the same time period, came back higher (in some cases substantially higher) than [the Citi Parties'] marks. The same held true, almost without exception, with respect to the original Facility collateral.

Id. Accordingly, CDO Fund refused to satisfy the additional margin calls. Id. ¶ 33.[10]

In response, the Citi Parties declared an event of default on December 24, 2008.[11] Id. ¶ 36. Thereafter, the Citi Parties exercised their contractual right to foreclose and liquidate the collateral and to offset the proceeds against payments owed by CDO Fund. Id. ¶¶ 36, 38-39; see also Haynes Decl. Ex. B ¶ 8(a)(iv). As alleged in the complaint, the Citi Parties held a total of three auctions in late December 2008 and February 2009, but sold only two of the assets.[12] Compl. ¶¶ 38-39. Therefore, the Citi Parties' retained most of the collateral

---

[10]   However, it appears that CDO Fund ultimately offered to post additional collateral. See id. ¶ 36 (alleging that "CDO Fund had even offered to post more collateral").

[11]   The Citi Parties allegedly declared the event of default under section 4(b) of the CSAA. Id. ¶ 36. That section provides: "By the Transfer Deadline on each Business Day, Counterparty shall make all Transfers required to be made by Counterparty pursuant to the notice given under Section 3 hereof. Neither party shall be excused from making any Transfer by the Transfer Deadline as required herein for any reason whatsoever." Haynes Decl. Ex. K § 4(b).

[12]   Specifically, CDO Fund claims that Morgan Stanley held two auctions on December 29, 2008, and that third-party broker SMH held an auction for the remaining assets in late February 2009. Compl. ¶¶ 38-39.

they seized.  Id.

CDO Fund alleges that the auctions were an "elaborate sham" designed to make it look like the Citi Parties were marketing the assets when, in reality, they had no intention of selling them.[13]  Id. ¶ 40.  CDO Fund claims that, as the assets regained their value, the Citi Parties "reaped an undeserved benefit of approximately $200 million, measured by the value of the improperly seized collateral from the time of the wrongful seizure to current values."  Id. ¶ 44.

## IV.  **The Instant Action**

On April 5, 2012, CDO Fund commenced this action asserting claims for breach of contract; breach of the implied covenant of good faith and fair dealing; violation of Article 9 of the U.C.C.; and unjust enrichment, with an accompanying request for imposition of a constructive trust.  The Citi Parties now move to dismiss CDO Fund's claims.

## DISCUSSION

## I.  **Legal Standards**

To survive a motion to dismiss, the pleadings must include "enough facts to state a claim for relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Where a plaintiff has not "nudged [its] claims across

---

[13]   In particular, CDO Fund maintains that the Citi Parties sold the assets when the market was illiquid, id. ¶ 38, and that they "failed to market or offer the assets to typical industry players," id. ¶ 40.

the line from conceivable to plausible," dismissal is appropriate. Id. In applying these standards, we accept as true all factual allegations in the pleadings and draw all reasonable inferences in the non-moving party's favor. Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). However, "we give no effect to assertions of law or to legal conclusions couched as factual allegations." Id. (internal quotation marks and alterations omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

In undertaking our analysis, we may consider "the complaint and any documents attached thereto or incorporated by reference." Bldg. Indus. Elec. Contractors Ass'n v. City of New York, 678 F.3d 184, 187 (2d Cir. 2012). "Because the interpretation of contracts generally is a question of law to be determined by the Court, it may dismiss the complaint where contracts are unambiguous and do not support the plaintiff's claim." Soroof Trading Dev. Co., Ltd. v. GE Fuel Cell Sys., LLC, 842 F. Supp. 2d 502, 509-10 (S.D.N.Y. 2012) (internal quotation marks omitted); see also DynCorp v. GTE Corp., 215 F. Supp. 2d 308, 315 (S.D.N.Y. 2002) (noting that dismissal is appropriate where "the contract unambiguously shows that the plaintiff is not entitled to the requested relief").

13

## II.  **Breach of Contract**

CDO Fund alleges that the Citi Parties breached the CSAA and the Underlying Contracts (collectively, the "Contracts") by:

- failing to use good faith in determining the value of underlying securities;

- engaging in acts constituting coercion and economic duress to force CDO Fund to meet improperly calculated margin calls, post additional collateral, and agree to certain contractual amendments;

- failing to specify the nature of the potential termination event or provide relevant information reasonably requested by CDO Fund;

- failing to provide any statement or other information to CDO Fund detailing any deficiency in any of the financing transactions;

- failing to identify termination or settlement amounts due or giving CDO Fund notice of the results of any set off or netting pursuant to the CSAA;

- improperly seizing assets; and

- failing to provide an accounting detailing the results of the Citi Parties' efforts to sell the seized collateral.

See Compl. ¶ 49.

In support of their motion to dismiss these claims, the Citi Parties contend that CDO Fund waived any alleged breach concerning collateral valuations and margin calls by (i) continuing to perform and accept benefits under the Contracts with contemporaneous knowledge of the purported breach and (ii)

14

failing to invoke the dispute resolution provisions set forth in the Credit Support Annex.   In addition, the Citi Parties maintain that CDO Fund's allegations fail to state a claim.   We address these arguments in turn.

### A.   On the Facts Alleged, CDO Fund Did Not Waive the Alleged Breaches

Waiver is the "voluntary and intentional" abandonment of a known contractual right.   Amerex Grp., Inc. v. Lexington Ins. Co., 678 F.3d 193, 201 (2d Cir. 2012) (internal quotation marks omitted).   Waiver may be express or implied.   Hadden v. Consol. Edison Co., 382 N.E.2d 1136, 1138 (N.Y. 1978) (noting that a waiver "may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage").   In either case, however, waiver "is 'essentially a matter of intention.'"   Ring v. Mpath Interactive, Inc., 302 F. Supp. 2d 301, 304 (S.D.N.Y. 2004) (quoting Alsens Am. Portland Cement Works v. Degnon Contracting Co., 118 N.E. 210, 210 (N.Y. 1917)).

A party's intention to relinquish its known contractual rights must be "clear, unmistakable, and without ambiguity," Faiveley Transp. USA, Inc. v. Wabtec Corp., 758 F. Supp. 2d 211, 217 (S.D.N.Y. 2010) (internal quotation marks omitted), and "is not to be inferred from a doubtful or equivocal act." Echostar Satellite L.L.C. v. ESPN, Inc., 914 N.Y.S.2d 35, 39 (N.Y. App.

Div. 2010) (internal quotation marks omitted); see also Amerex
Grp., 678 F.3d at 201 (noting that waiver does not arise from
"negligence, oversight, or silence") (internal quotation marks
omitted); Alsens, 118 N.E. at 210 (stating that a party's
"undisputed acts or language" must be "so inconsistent with his
purpose to stand upon his rights" that there is "no opportunity
for a reasonable inference to the contrary").

Where, as here, an alleged waiver is implied, the defense
"is 'rarely established as a matter of law rather than as a
matter of fact.'" Wyeth v. King Pharm., Inc., 396 F. Supp. 2d
280, 290 (E.D.N.Y. 2005) (quoting Alsens, 118 N.E. at 210); see
also Great Am. Ins. Co. v. M/V Handy Laker, Nos. 96 Civ. 8737
(BSJ), 97 Civ. 7400 (BSJ), 2002 WL 32191640, at *7 (S.D.N.Y.
Dec. 20, 2002) ("[C]ourts generally hold that whether waiver has
been established by the conduct of the parties during the
performance of the contract is a question of fact."), aff'd, 348
F.3d 352 (2d Cir. 2003).  Therefore, unless "waiver is clear on
the face of the complaint," it is inappropriate for resolution
on a motion to dismiss.  Eastman Chem. Co. v. Nestle Waters
Mgmt. & Tech., No. 11 Civ. 2589 (JPO)(HBP), 2012 WL 4474587, at
*3 (S.D.N.Y. Sept. 28, 2012).

In this case, although a finding of waiver finds support in
relevant case law, see VCG Special Opportunities Master Fund
Ltd. V. Citibank, N.A., 594 F. Supp. 2d 334 (S.D.N.Y. 2008); CDO

Plus Master Fund Ltd. v. Wachovia Bank, N.A., No. 07 Civ. 11078 (LTS)(AJP), 2009 WL 2033048 (S.D.N.Y. July 13, 2009), we believe this outcome would be premature given the complexity of the facts and the absence of discovery.  Even assuming, arguendo, that an implied waiver could be found under the Contracts,[14] it is not "clear on the face of the complaint" that CDO Fund intentionally relinquished its contractual rights.  As an

_____

[14]   This question arises because the CSAA contains a no-waiver clause. Specifically, the CSAA provides that no "waiver in respect of any Contract will be effective unless in writing," see Haynes Decl. Ex. K § 18(a), and that no "course of dealing [shall] be deemed to preclude any subsequent exercise of any right, power or privilege" in respect of any Contract, see id. Ex. K § 18(c); see also id. Ex. A § 9(f).  Under New York law, courts "uniformly enforce" such provisions to preclude an implied waiver. Rosenzweig v. Givens, 879 N.Y.S.2d 387, 390 (N.Y. App. Div. 2009), aff'd, 915 N.E.2d 1140 (N.Y. 2009); see also MBIA Ins. Corp. v. Patriarch Partners VIII, LCC, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) (declining to find an implied waiver where the contract at issue contained a no-waiver clause); Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 310 (S.D.N.Y. 2010) (same).  But see Kenyon & Kenyon v. Logany, LLC, 823 N.Y.S.2d 72, 74 (N.Y. App. Div. 2006) ("[T]he existence of a nonwaiver clause does not in itself preclude waiver of a contract clause.") (internal quotation marks omitted). Nothing in the November 2008 Agreement purports to waive CDO Fund's rights under the Contracts.  See Haynes Decl. Ex. L.  In light of the foregoing authorities, the absence of an express waiver may result in an insurmountable hurdle for the Citi Parties.

On the other hand, we note that some of the Underlying Contracts require a party to provide notification of a counterparty's alleged failure to perform its obligations under the Contracts, see, e.g., id. Ex. A § 5(a)(ii), id. Ex. B ¶ 5, and that CDO Fund does not explicitly allege to have provided such formal notification here.  Some courts have suggested that a party's "failure to provide notice pursuant to a contractual provision effectively abrogate[s] that contract's non-waiver provision."  In re Arbitration Between Atherton & Online Video Network, Inc., 274 F. Supp. 2d 592, 595-96 (S.D.N.Y. 2003) (collecting cases).  However, even if the notice requirements trump the no-waiver provisions here, factual questions would nonetheless remain.  See Compl. ¶ 32 (alleging that CDO Fund "disputed" the Citi Parties' mark-downs and "requested specific details justifying" their calculations); see also Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004) (noting, in the context of the election of remedies doctrine, that the question of what constitutes adequate notice is often a factual issue, particularly when "notice has not been given in an unequivocal form such as a lawyer's letter").  Given these contradictions in the legal landscape -- and our obligation to read the complaint in the light most favorable to CDO Fund -- we are in no position to resolve the question of whether an implied waiver could be found.  The parties would be well advised to brief this issue in the future, as they have not done so now.

initial matter, CDO Fund alleges that it continued performing under the Contracts solely as a consequence of the Citi Parties' coercion and economic duress.  See, e.g., Compl. ¶ 27.  Although these allegations cannot form the basis of an independent breach, infra Section II(B), they nonetheless raise issues as to whether CDO Fund voluntarily and intentionally abandoned its rights.  Cf. Milgrim v. Backroads, Inc., 142 F. Supp. 2d 471, 476 (S.D.N.Y. 2001) (noting that duress may "contradict" a party's intentions with respect to a contract) (internal quotation marks omitted).

Moreover, CDO Fund alleges that, during the course of its performance, it repeatedly "disputed" the Citi Parties' mark-downs, "requested specific details justifying" the valuations, and "insisted" that the Citi Parties "revise" their calculations to conform with other third-party marks.  Compl. ¶¶ 32, 35; see also id. ¶¶ 25, 28, 30.  As the Citi Parties contend, these allegations demonstrate CDO Fund's contemporaneous knowledge of the breaches it now claims.  Nevertheless, waiver is ultimately a matter of intent, and "a party's reluctance to terminate a contract" and "its attempts to encourage the breaching party to adhere to its obligations" do not demonstrate the unmistakable intention to abandon contractual rights.  AM Cosmetics, Inc. v. Solomon, 67 F. Supp. 2d 312, 318 (S.D.N.Y. 1999) (internal

quotation marks omitted); see also S.D. Hicks & Son Co. v. J.T. Baker Chem. Co., 307 F.2d 750, 751 (2d Cir. 1962).

As to CDO Fund's alleged failure to invoke the Credit Support Annex's dispute resolution mechanism, the governing provisions simply required CDO Fund to "notify" CBNA of the dispute.[15]   Haynes Decl. Ex. B ¶ 5.   The provisions do not require that the notice adhere to a particular form or means (e.g., a written demand), nor that the notice formally reference the dispute resolution process.   Id.   As noted supra, CDO Fund has plausibly alleged that it "disputed" and "vehemently den[ied]" the Citi Parties' marks.   Compl. ¶¶ 30, 32. Interpreting the complaint in the light most favorable to the non-movant, we cannot conclude at this stage that these communications did not trigger the dispute resolution provisions.   Cf. Medinol, 346 F. Supp. 2d at 620.   Additionally, the CBNA ISDA explicitly provided that "[a] failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver."[16]   Haynes Decl. Ex. A § 9(f).   As noted supra, the parties have yet to address the impact of this provision.   See n.14.

---

[15]   Because these provisions were a species of the Credit Support Annex, an argument could be made that the dispute resolution mechanism was only available to CDO Fund to the extent it challenged the Citi Parties' valuation of the collateral underlying the CDS Transaction.   The allegations make clear, however, that CDO Fund also contested the Citi Parties' valuation of the Facility collateral.   See Compl. ¶¶ 24, 28.

[16]   By its terms, the Credit Support Annex "is subject to" the CBNA ISDA. See Haynes Decl. Ex. B, at 1.

For the foregoing reasons, we cannot conclude at this juncture in the proceedings that an implied waiver has occurred. In reaching this conclusion, we are mindful that waiver "should not be lightly presumed." Globecon Grp., LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 176 (2d Cir. 2006) (internal quotation marks omitted). However, we share the Citi Parties' concern that CDO Fund's continued performance under the Contracts, together with its three-year delay in filing the instant action,[17] has essentially permitted CDO Fund to challenge the Citi Parties' valuations risk free and with the benefit of hindsight. To the extent that discovery confirms the Citi Parties' position that real-time valuations of the collateral cannot be recreated, any failure to unequivocally invoke the dispute resolution provisions might well undermine CDO Fund's claims.

**B. CDO Fund Has Sufficiently Alleged a Breach of Contract with Respect to the Citi Parties' Collateral Valuations, Declaration of an Event of Default, and Seizure of the Assets**

To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii)

---

[17]    During oral argument, counsel for CDO Fund explained that the reason for the three-year delay was that CDO Fund was trying to maintain its existing relationship with the Citi Parties. See Tr. 17, 23. To the extent this is true, it may demonstrate that CDO Fund intended to (and did) relinquish its contractual rights in an effort to protect its broader business interests.

failure of defendant to perform; and (iv) damages." <u>Johnson v. Nextel Commc'ns, Inc.</u>, 660 F.3d 131, 142 (2d Cir. 2011); <u>accord Mee Direct, LLC v. Automatic Data Processing, Inc.</u>, 958 N.Y.S.2d 385, 386 (N.Y. App. Div. 2013).   In addition, the complaint must specify the provisions of the contract that the defendant allegedly breached.   <u>See, e.g.</u>, <u>Fink v. Time Warner Cable</u>, 810 F. Supp. 2d 633, 644-45 (S.D.N.Y. 2011) (noting that "a breach of contract claim will be dismissed where a plaintiff fails to allege . . . the specific provisions of the contract upon which liability is predicated") (internal quotation marks omitted); <u>accord</u> <u>Barker v. Time Warner Cable, Inc.</u>, 923 N.Y.S.2d 118, 120 (N.Y. App. Div. 2011).

Here, CDO Fund has adequately alleged that the Citi Parties failed to use good faith in determining the value of collateral.[18]   In its complaint, CDO Fund alleges that "there was no reasonable or good faith basis for continuously reducing asset marks," because there was "little trading" on such assets and "very little, if any, downward market movement."   Compl. ¶ 35.   To substantiate these claims, CDO Fund alleges that "other third-party marks for the specific assets comprising the free collateral, during the same period, came back higher (in

---

[18]   As the Citi Parties point out, CDO Fund did not specify the contractual provisions forming the basis of the alleged breach.   Nevertheless, we are satisfied that the allegations placed the Citi Parties "on notice of the grounds for which plaintiff seeks relief."   <u>Greenspan v. Allstate Ins. Co.</u>, 937 F. Supp. 288, 291 (S.D.N.Y. 1996) (internal quotation marks omitted).

some cases substantially higher)" that the Citi Parties' marks.[19]
Id.  Construing the facts in the light most favorable to CDO
Fund, we find these allegations "facially plausible" and
sufficient to "draw the reasonable inference" that the Citi
Parties engaged in wrongful conduct.  Iqbal, 556 U.S. at 678.
Therefore, the first alleged breach claim survives.

Nevertheless, many of the remaining breach allegations are
deficient as a matter of law.  In its complaint, CDO Fund
alleges that the Citi Parties breached the Contracts by
"engaging in acts constituting coercion and economic duress."
Compl. ¶ 49.  Economic duress is a theory of recovery for
rescission, cf. Bank Leumi Trust Co. v. D'Evori Int'l, Inc., 558
N.Y.S.2d 909, 914 (N.Y. App. Div. 1990) ("[W]e do not believe
that the doctrine of economic duress, which is traditionally
used as a defense to an action, has any place in a cause of
action seeking monetary damages."), and thus has no application
here.  However, even if this were not the case, we note that CDO
Fund has not claimed duress with the alacrity the law demands.
See, e.g., In re Toscano, 799 F. Supp. 2d 230, 244 (E.D.N.Y.
2011) ("A party seeking to cancel a contract on the basis of
duress must do so promptly or they will be deemed to have
ratified the contract.") (internal quotation marks omitted); see

---

[19]   CDO Fund makes the same allegations with respect to the Facility
collateral.  Compl. ¶ 35.

also <u>Bank Leumi Trust</u>, 558 N.Y.S.2d at 914 (finding a right to assert duress forfeited after a six-month delay).

CDO Fund next alleges that the Citi Parties breached the Contracts by failing to (i) "specify the nature of the potential termination event or provide relevant information reasonably requested by CDO Fund," (ii) "provide any statement or other information to CDO Fund detailing any deficiency in any of the financing transactions," (iii) "identify termination or settlement amounts due or giving CDO Fund notice of the results of any set off or netting pursuant to the CSAA," and (iv) "provide an accounting detailing the results of [the Citi Parties'] efforts to sell the seized collateral." Compl. ¶ 49. These allegations are insufficient, because CDO Fund has failed to set forth the contractual provisions that the Citi Parties allegedly breached.   Indeed, as the Citi Parties point out -- and CDO Fund does not contest -- the Contracts explicitly permitted much of the conduct alleged.  For instance, the CDS Contracts provided that CDO Fund "[was] not entitled to prior notice of any sale of [the] Posted Collateral by [CBNA], except any notice that is required under applicable law and cannot be waived." <u>Id.</u> Haynes Decl. Ex. B ¶ 8(a).  Therefore, these claims fail as a matter of law.

Finally, CDO Fund alleges that the Citi Parties breached the Contracts by improperly declaring an Event of Default,

Compl. ¶ 8, and wrongfully seizing the assets, id. ¶ 49. Because CDO Fund has sufficiently alleged that the Citi Parties failed to use good faith in determining the value of the collateral, it has stated an entitlement to relief with respect to the resultant declaration of an Event of Default and seizure of the assets, as any such actions were the by-product of the Citi Parties' allegedly improper marks and margin calls. Cf. MHR Capital Partners LP v. Presstek, Inc., 912 N.E.2d 43, 48 (N.Y. 2009) ("[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.") (internal quotation marks omitted); Morris v. Lee, No. 08 Civ. 6673 (LAP), 2011 WL 2947009, at *1 (S.D.N.Y. July 18, 2011) ("[U]nder New York law, when a breaching party's actions contribute materially to the nonoccurrence of the other party's duties, the non-occurrence is excused."). Therefore, we conclude that CDO Fund has stated a plausible breach of contract claim on the basis of the Citi Parties' collateral valuations, declaration of an Event of Default, and seizure of the assets.

## III. Implied Covenant of Good Faith and Fair Dealing

In its second cause of action, CDO Fund alleges that the Citi Parties breached the implied duty of good faith and fair dealing by, inter alia, failing to use good faith in determining the value of collateral and improperly seizing the underlying

assets.  See Compl. ¶ 55.  This claim fails as duplicative.
"'New York law does not recognize a separate cause of action for
breach of the implied covenant of good faith and fair dealing
when a breach of contract claim, based upon the same facts, is
also pled.'"  Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d
290, 299 (S.D.N.Y. 2012) (alteration omitted) (quoting Harris v.
Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir.
2002)).  Here, the allegations supporting the purported breach
of the duty of good faith and fair dealing are the predicate for
the alleged breach of contract and, indeed, are "intrinsically
tied to the damages" purportedly arising therefrom.[20]  Sawabeh
Info. Servs. Co. v. Brody, 832 F. Supp. 2d 280, 301 (S.D.N.Y.
2011) (internal quotation marks omitted).  Therefore, dismissal
of the second cause of action is appropriate.

IV.  **Article 9 of the U.C.C.**

In its third cause of action, CDO Fund alleges that the
Citi Parties violated Article 9 of the U.C.C. by (i) neglecting
to provide "reasonable authenticated notic[e]" of any sale of
collateral, (ii) failing to dispose of the assets in a

---

[20]    To the extent CDO Fund is attempting to plead a breach of the duty of
good faith and fair dealing in connection with the Citi Parties' alleged
failure to provide certain notices and accounting details, then CDO Fund was
required to adequately plead a breach of a particular term of the Contracts.
In re Worldcom, Inc. Sec. Litig., 456 F. Supp. 2d 508, 519 (S.D.N.Y. 2006);
see also Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.,
No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *7 (S.D.N.Y. Aug. 15, 2012)
(noting that the implied covenant "does not impose obligations beyond those
intended and stated in the language of the contract").  Because CDO Fund has
not satisfied this requirement, supra Section II(B), any corresponding
implied covenant claims necessarily fail.

commercially reasonable manner, and (iii) failing to provide a post-sale accounting.  Compl.  ¶¶ 38-41, 61.  All but the first allegation survive.

The statutory notice requirement does not apply where the collateral "threatens to decline speedily in value or is of a type customarily sold on a recognized market," see N.Y. U.C.C. § 9-611(d), and the Contracts explicitly provide that this is the case here, see Haynes Decl. Ex. B ¶ 8(a) (acknowledging and agreeing that "Posted Collateral in the form of securities may decline speedily in value and is of the type customarily sold on a recognized market").[21]  Therefore, CDO Fund's first alleged violation of the U.C.C. fails.

Nonetheless, CDO Fund has sufficiently alleged that the Citi Parties violated the U.C.C. by failing to sell the collateral in a commercially reasonable manner and neglecting to provide a post-sale accounting.  See Compl. ¶ 38 (claiming that the Citi Parties held two auctions scheduled to conclude on New Year's Eve, "when the market is highly illiquid"); id. ¶ 40 (alleging that the Citi Parties "failed to market or offer the assets to typical industry players, essentially failing to even attempt to engage third parties"); id. ¶ 41 (claiming that the Citi Parties "never indicated which, if any, assets were sold

---

[21]   As a result, we need not reach the Citi Parties' contention that the notice claim is time-barred.

(and at what price) or which, if any assets it retained"). Although the Citi Parties may dispute the viability of CDO Fund's claims,[22] questions of commercial reasonableness are necessarily fact intensive. See, e.g., In re Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989) (applying New York law and noting that "[w]hether a sale was commercially unreasonable is, like other questions about 'reasonableness,' a fact-intensive inquiry"); see also Seomi v. Sotheby's, Inc., 910 N.Y.S.2d 765, at *3 n.3 (N.Y. Sup. Ct. 2010) (Table) (noting that the question of commercial reasonableness raises "issues of fact more appropriate for determination on a motion for summary judgment than on a motion to dismiss"). Therefore, dismissal of CDO Fund's third cause of action is unwarranted at this stage in the proceedings.

## V.   Unjust Enrichment and Constructive Trust

Finally, CDO Fund asserts a claim for unjust enrichment and seeks the imposition of a constructive trust. Such claims fail as a matter of law. It is well-established that the existence of a valid and enforceable contract "precludes" unjust enrichment and constructive trust claims. In re First Cent. Fin. Corp., 377 F.3d 209, 213 (2d Cir. 2004); see also Soroof,

---

[22]   Such skepticism might well be justified. At oral argument, counsel for CDO Fund was unable to name a single "typical industry player" whom the Citi Parties allegedly excluded from the sales process. See Tr. 21-22. When pressed on this point, counsel indicated that he could obtain this information "quite quickly" from his client. Id. 22. In that circumstance, it is curious that the players were not named in the complaint.

842 F. Supp. 2d at 514 (granting defendant's motion for judgment on the pleadings with respect to plaintiff's unjust enrichment and constructive trust claims where the parties' "relationship was, at all relevant times, governed by a contract"). Because it is undisputed that the Contracts govern the parties' rights and obligations here, there is simply no basis for relief under quasi-contractual remedies. We therefore dismiss CDO Fund's fourth and fifth causes of action.

## CONCLUSION

For the foregoing reasons, the motion (docket no. 22) is granted in part and denied in part. The parties are directed to confer and submit to the Court a proposed schedule for discovery on the remaining claims asserting breach of contract and violation of Article 9 of the U.C.C.

Dated:     New York, New York
           March 21, 2013


                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiff**

Kieran M. Corcoran, Esq.
Lackey Hershman, L.L.P.
1325 Avenue of the Americas, 28th Floor
New York, New York 10019

Ross A. Mortillaro, Esq.
Paul B. Lackey, Esq.
Michael P Aigen, Esq.
Lackey Hershman, L.L.P.
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219

**Attorneys for Defendants**

Marshall H. Fishman, Esq.
Patrick D. Oh, Esq.
Becca Everhardt, Esq.
Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
New York, New York 10022