UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
HIGHLAND CDO OPPORTUNITY MASTER
FUND, L.P.,

               Plaintiff,

     - against -

CITIBANK, N.A., CITIGROUP GLOBAL
MARKETS INC., CITIGROUP GLOBAL
MARKETS LIMITED, and CITIGROUP
FINANCIAL PRODUCTS INC.,

               Defendants.
-------------------------------
CITIBANK, N.A., CITIGROUP GLOBAL
MARKETS INC., CITIGROUP GLOBAL
MARKETS LIMITED, and CITIGROUP
FINANCIAL PRODUCTS INC.,

               Counterclaim-Plaintiffs,

     - against -

HIGHLAND CDO OPPORTUNITY MASTER
FUND, L.P.,

               Counterclaim-Defendant,
               and

HIGHLAND CDO OPPORTUNITY FUND GP, L.P.,
and HIGHLAND CAPITAL MANAGEMENT, L.P.,

               Additional Defendants to
               Counterclaim.
-------------------------------X

**MEMORANDUM AND ORDER**
  12 Civ. 2827 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Highland CDO Opportunity Master Fund, L.P. ("CDO

Fund"), commenced this action in 2012 against defendants Citibank

N.A. ("CBNA"), Citigroup Global Markets Limited ("CGML"), Citigroup Financial Products Inc. ("CFPI"), and Citigroup Global Markets Inc. (together, "Citi"), asserting claims for, inter alia, breach of contract and violation of Article 9 of the New York Uniform Commercial Code (the "UCC").  CDO Fund's claims arise from margin calls issued by Citi in December 2008 in connection with credit default swaps ("CDS") entered into by CDO Fund and Citi. CDO Fund failed to meet the margin calls, ultimately leading to Citi declaring an event of default, seizing the assets CDO Fund had posted to collateralize the CDS, and conducting two auctions to sell the collateral.  CDO Fund principally alleges that Citi's valuations giving rise to the margin calls were not in good faith and were not commercially reasonable and thus in breach of the parties' agreements governing the CDS, and that Citi's subsequent auctions of CDO Fund's collateral violated the UCC.  Citi brings counterclaims for contractual indemnification and to recover the deficit allegedly owed under the agreements as a result of CDO Fund's failure to meet the 2008 margin calls.  Citi seeks to hold Highland CDO Opportunity Fund GP, L.P. ("Highland GP") and Highland Capital Management, L.P. ("HCM," and together with Highland GP and CDO Fund, "Highland"), jointly and severally liable for those obligations.

CDO Fund/Highland now move for summary judgment on CDO Fund's claims against Citi and on Citi's counterclaims against Highland, and Citi moves for summary judgment on CDO Fund's claims.  Because no rational trier of fact could conclude that CDO Fund availed itself of the mandatory dispute resolution mechanism contained in the parties' agreements for adjudicating objections to margin call calculations, it cannot now challenge Citi's calculation of the 2008 calls, and we grant Citi's motion with respect to CDO Fund's breach-of-contract claim.  We also grant Citi's motion with respect to CDO Fund's UCC claim to the extent it is based on Citi's sale of collateral in March 2009; deny the remainder of Citi's motion; and deny CDO Fund/Highland's motion in its entirety.

**BACKGROUND**[1]

## I. __The Parties__

HCM is an investment adviser specializing in, __inter alia__, senior secured bank loans, credit, and structured products.  D56.1 ¶ 1.  Its co-founder and president is James Dondero.  __Id.__ ¶ 14; P56.1 Ctr. Stmt. ¶ 14.

CDO Fund is an exempted limited partnership organized under

---

[1] The facts recited throughout this Memorandum and Order are drawn from the following sources: the complaint, filed in the Supreme Court of the State of New York, County of New York, on April 5, 2012, and removed to this District on April 10, 2012 ("Compl."); Citi's amended and supplemental counterclaims filed on July 16, 2013 ("Am. Countercls."); Plaintiff's and Counter-Defendants' Rule 56.1 Statement of Material Facts in Support of Motion for Summary Judgment ("P56.1"); Defendants' Counterstatement in Opposition to Highland's Rule 56.1 Statement of Material Facts ("D56.1 Ctr. Stmt."); the declaration of Isaac Leventon in support of Highland's motion for summary judgment ("Leventon Decl.") and the exhibits attached thereto; the declarations of Jeffrey Prudhomme filed in support of Highland's motion for summary judgment and in opposition to Citi's motion for summary judgment ("Prudhomme Decl.") and the exhibits attached thereto; Defendants' Statement of Undisputed Material Facts ("D56.1"); Plaintiff's Response to Defendants' Statement of Undisputed Material Facts ("P56.1 Ctr. Stmt."); Defendants' Counterstatement in Opposition to CDO Fund's Supplemental Statement of Facts; the declaration of Robert J. McCallum in support of Citi's motion for summary judgment ("McCallum Decl.") and the exhibits attached thereto; the supplemental declaration of Robert J. McCallum in opposition to Highland's motion for summary judgment ("McCallum Supp. Decl.") and the exhibits attached thereto; the reply declaration of Robert J. McCallum in support of Citi's motion for summary judgment and the exhibits attached thereto; the declaration of Brian Bejile in support of Citi's motion for summary judgment ("Bejile Decl.") and the exhibits attached thereto; the memoranda submitted in connection with the motions for summary judgment, including Plaintiff's and Counter-Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Highland Mem."), and Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("CDO Fund Opp. Mem."); and the transcript of the oral argument on the parties' motions held on February 18, 2016 ("Oral Arg. Tr.").  We also cite to the transcripts of the depositions of Philip Braner ("Braner Tr."), James Dondero ("Dondero Tr."), Ansel Eshelman ("Eshelman Tr."), Isaac Leventon ("Leventon Tr."), Gibran Mahmud ("Mahmud Tr."), Paul Roos ("Roos Tr."), and Daniel I. Castro, Jr. ("Castro Tr."), excerpts of which are included as exhibits to the above-referenced declarations.

Bermuda law.  P56.1 ¶ 3; D56.1 ¶ 11.  HCM served as CDO Fund's investment manager pursuant to an investment management agreement. P56.1 ¶ 14; D56.1 ¶ 10.  Neither CDO Fund nor its general partner, Highland GP, had any employees during the fourth quarter of 2008. D56.1 ¶ 12; P56.1 Ctr. Stmt. ¶ 12.  At that time, then-HCM employee Gibran Mahmud was one of three portfolio managers for CDO Fund and then-HCM employee Paul Roos was a senior analyst for structured products reporting to Mahmud.  D56.1 ¶¶ 15-16; P56.1 Ctr. Stmt. ¶¶ 15-16.  HCM structured CDO Fund to trade primarily collateralized debt obligations and collateralized loan obligations.  D56.1 ¶ 4.

A collateralized loan obligation ("CLO"), a species of collateralized debt obligation ("CDO"), is a securitized pool of below investment grade corporate loans.  Id. ¶ 5.  The loan assets serve as the collateral for the CLO, and cash flows that come from the assets into the CLO are distributed in order of priority among different classes, or "tranches," including multiple debt or liability classes and an equity class, in accordance with a documented payment waterfall.  Id. ¶ 7.  CDO Fund principally invested in equity and mezzanine tranches of CLOs, the two lowest priority classes: if cash flows generated by the assets underlying

the CLO were insufficient to pay all of the investors, the equity interests were the first not to be paid.  Id. ¶¶ 6, 8.

Citi and HCM had a business relationship that predated the events at issue: HCM was an important Citi client and one with whom Citi conducted numerous transactions.  Id. ¶¶ 19-20.  As part of the relationship, Citi's CLO primary structuring desk would arrange, originate and structure new CLOs for HCM and distribute the securities issued by those CLOs into the market.  Id. ¶ 21. The co-head of Citi's CLO primary business was John Clements.  Id. ¶ 22.  Citi's secondary CDO desk was a market maker that purchased and sold CLO positions from and to Citi's clients, and in the fall of 2008, Brian Bejile was the associate on the desk principally responsible for marking the collateral and pricing the CDS at issue in this case.  Id. ¶ 25.

## II.  **The CDS Transactions**

In the fall of 2008, CDO Fund was a party to two financing transactions with Citi: (1) a secured loan facility with a maturity date of December 1, 2008 (the "Loan Facility"); and (2) a series of CDS with an aggregate notional value of $59 million (the "CDS Transactions").  Compl. ¶¶ 20-21; P56.1 ¶¶ 17, 82 & n.103. Pursuant to the Loan Facility, CBNA and CFPI loaned cash to CDO

Fund secured by CDO Fund's collateral comprised of mezzanine and equity tranches of CDOs and CLOs.  Id. ¶ 16.

While the Loan Facility was material to Citi's motion to dismiss, the claims and counterclaims remaining in this action are primarily directed at the CDS Transactions, in which Citi was the buyer and CDO Fund was the seller of credit protection relating to "reference obligations" consisting primarily of relatively junior tranches of CDOs and CLOs.  Id. ¶ 22.  As the protection buyer, Citi agreed to make regular fixed payments to CDO Fund, while, as seller, CDO Fund was obligated to make floating payments to Citi, but only if certain credit events occurred with respect to a reference obligation.  Id. ¶ 23.

The CDS Transactions were governed by the following agreements between CDO Fund and certain of the Citi defendants (the "CDS Contracts"): a 1992 ISDA Master Agreement and the accompanying Schedule, dated January 12, 2007 (together with the Schedule, the "ISDA"); a 1994 ISDA Credit Support Annex, dated January 12, 2007 (the "CSA"); and the Restated Credit Support Administration Agreement, dated October 10, 2008 (the "CSAA"), a master agreement providing for coordinated administration of credit support under

the various transactions among CDO Fund and Citi.[2]  D56.1 ¶ 28;
Leventon Decl. ¶ 26; McCallum Decl., Ex. 75 (CSAA).  Each of the
CDS Contracts is governed by New York law.  See ISDA § 13(a); ISDA
Schedule Part 4(h); CSAA § 11(a).

Pursuant to the CDS Contracts, CDO Fund agreed to pledge
collateral consisting of cash and treasury bonds and, if agreed
upon by Citi, other types of collateral.  P56.1 ¶ 24.  CDO Fund
posted initial cash collateral, referred to as the "initial margin"
or the "Independent Amount," based on an agreed-upon percentage of
each reference obligation's initial face value.  Id. ¶ 27; see CSA
¶ 13(b)(iv)(A) (defining "Independent Amount" as "USD equivalent
of the amount as specified in the relevant Confirmation");
September 18, 2008 Amended Confirmation from Citibank, N.A. to CDO
Fund, Annex A, Leventon Decl., Ex. A-4 (listing "Initial Face
Amount" and Independent Amount percentages for reference
obligations).  By December 2008, as discussed below, CDO Fund had
posted noncash collateral, primarily in the form of CLO equity
tranches, to secure the CDS Transactions.  D56.1 ¶ 29.

---

[2] CGML and CBNA each entered into an ISDA and CSA with CDO Fund.  References to
either the ISDA or the CSA are to the agreements entered into with both Citi
entities.  See Leventon Decl., Exs. A-5, A-6 (ISDA); A-7, A-8 (ISDA Schedule);
A-9, A-10 (CSA).

A.  <u>Margin Calls</u>

Under the parties' financing agreements, CDO Fund agreed to post additional collateral (or "margin") if the value of the existing collateral decreased relative to Citi's exposure.  With respect to the CDS Transactions in particular, Citi was entitled to ask CDO Fund to transfer a "Delivery Amount" of additional collateral to Citi under certain circumstances.  CSA ¶ 3.

The "Delivery Amount" was calculated by Citi, the designated "Valuation Agent" under the CSA, as the amount by which the sum of Citi's "Exposure" on the CDS Transactions and the Independent Amount exceeded the "Value" of CDO Fund's posted collateral.  <u>See</u> CSA ¶ 13(c)(i) (defining "Valuation Agent" as "the Secured Party"); <u>id.</u> ¶ 3(a) (defining "Delivery Amount" as equal to amount by which "Credit Support Amount" exceeds "the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party"); <u>id.</u> ¶ 13(b)(i)(C) (defining "Credit Support Amount" to mean the "(i) Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor").  Citi calculated its "Exposure" on the CDS Transactions by determining the cost of replacement transactions, <u>i.e.</u>, what Citi would have to pay another party to purchase credit protection for the underlying reference obligations if the CDS Contracts were

–9–

terminated.  P56.1 ¶ 32; <u>see</u> CSA ¶ 12 (defining "Exposure").  The "Value" of CDO Fund's cash collateral was the amount thereof and the "Value" of CDO Fund's noncash collateral assets was determined by the "bid price" (meaning the price at which a buyer would be willing to purchase an asset) obtained by Citi, subject to agreed-upon haircuts.  <u>Id</u>; D56.1 ¶ 120.  The CDS Contracts required that "all calculations, valuations and determinations made by either party" be "made in good faith and in a commercially reasonable manner."  CSA ¶ 11(d).

Absent a dispute, CDO Fund was required to pay any margin call that Citi issued by 10:00 a.m. on a given business day on or before 5:00 p.m. that same day.  CSAA §§ 1, 3, 4(b).  CDO Fund agreed that it "shall not be excused" from the timely payment of margin calls "for any reason whatsoever," <u>id.</u> § 4(b), and that its unjustified failure to make timely payment would constitute a "Close-out Event" under the CSAA, <u>see</u> <u>id.</u> § 1 (defining "Close-out Event").  A Close-out Event permitted Citi to terminate the CSAA and/or any of the underlying contracts, net or set-off any termination amounts due, and "liquidate, apply, collect on and set off any or all Collateral and any Credit Support delivered under any Contract . . . against any Net Payment or other obligation (including delivery and collateral return obligations) owed to

it," id. §§ 6(a)-(b); see CSA ¶ 8(a)(iv) (upon certain events of default, Citi had the right to "liquidate any Posted Collateral . . . through one or more public or private sales or other dispositions . . . (with [Citi] having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds . . . from the liquidation of the Posted Collateral to any amounts payable by [CDO Fund]").  Both parties agreed that "Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market" and therefore CDO Fund was "not entitled to prior notice of any sale" of such collateral by Citi except any nonwaivable notice required by law.  Id. ¶ 8(a).

B.  The Dispute Resolution Provision

Paragraph five of the CSA provides a dispute resolution process for margin calls.  Under that provision, if CDO Fund "dispute[d] . . . the Valuation Agent's calculation of a Delivery Amount," then, as the "Disputing Party," it was first required to "notify the other party and the Valuation Agent," both of which would have been Citi, "not later than the close" of the first business day after "the date that the demand is made."  CSA ¶ 5.  By that same time, CDO Fund must have transferred any "undisputed amount" to Citi.  Id.  The parties were then required to "consult

-11-

with each other in an attempt to resolve the dispute," and if they failed to reach a resolution by "1:00 p.m., New York time" on the business day "following the date on which notice is given that gives rise to a dispute," Citi was required to recalculate the Delivery Amount and to notify CDO Fund of its recalculation by 10:00 a.m. on the second business day after notice was given.  Id. ¶¶ 5, 13(c)(iv), (f)(i).  At the recalculation stage, Citi was required to recalculate disputed Exposure and/or disputed Value of posted collateral by, inter alia, seeking market quotations.  Id. ¶¶ 5(i), 13(f)(ii).[3]  Upon demand following notice of recalculation or a resolution following consultation, the "appropriate party" would then "make the appropriate Transfer."  Id. ¶ 5.

## III.   CDO Fund's Performance in Fall 2008

The value of CDO Fund's holdings plummeted in 2008, especially in the fourth quarter.  Asset values across many different classes

---

[3] The Valuation Agent, in this case Citi, would recalculate Exposure by utilizing any calculations of Exposure that the parties "agreed are not in dispute" and calculate disputed Exposure by "seeking four actual quotations at mid-market from Reference Market-makers . . . taking the arithmetic average of those obtained; provided that if four quotations are not available for a particular Transaction . . . , then fewer than four quotations may be used for that Transaction  . . . and if no quotations are available for a particular Transaction . . . , then [Citi's] original calculations will be used for that Transaction." CSA ¶ 5(i)(A)-(B) (emphasis in original).  Similarly, Citi would recalculate the "Value" of noncash collateral assets by adding accrued interest for an asset to either (i) the mean of the mid-market quotations for that asset on the relevant date obtained from three nationally recognized principal market makers; or (ii) if no such quotes were available, the mean of the "closing bid prices" for the asset "on the next preceding date." Id. ¶ 13(f)(ii).

were falling at the time, including the assets in which CDO Fund and other Highland funds were invested.  D56.1 ¶ 47.  Current and former Highland employees testified to the extraordinary upheaval in financial markets during the fourth quarter of 2008.  See, e.g., Braner Tr. at 60 (fair to classify markets as "in a state of extreme distress"); Mahmud Tr. at 35-37 (describing markets as "chaos" and "chaotic"); Roos Tr. at 20 (market was "poor," "not good at all," "[t]he world was coming to an end, Armageddon"); Dondero Tr. at 57 ("[T]he world almost ended in the fourth quarter of '08 and nothing was trading normally.").

Moreover, there was substantial panic by investors in the type of assets that comprised the collateral for the financing facilities between CDO Fund and Citi.  D56.1 ¶ 42; Compl. ¶ 2. Investments in CLO mezzanine and equity tranches accounted for the bulk of CDO Fund's reported net loss of 26.38% in September 2008. D56.1 ¶ 50.  HCM's October performance estimate for CDO Fund showed an estimated gross return of negative 67.44% for that month and negative 82.06% for the year to date, with the majority of the losses attributable to CLO equity and mezzanine tranches.  Id. ¶ 52; see McCallum Decl., Ex. 10 (November 14, 2008 Highland e-mail containing October 2008 performance estimate for CDO Fund). On December 19, 2008, CDO Fund's administrator circulated a draft

net asset value calculation for CDO Fund reflecting a net asset value of negative 113% as of the end of November.  D56.1 ¶ 53.

Highland testified that it was "safe to presume" that the majority of CDO Fund's financing counterparties were issuing margin calls to CDO Fund in the fall of 2008, and in October 2008, CDO Fund received margin calls from Goldman Sachs, JPMorgan, and Natixis.  Braner Tr. at 252-53; P56.1 Ctr. Stmt ¶ 64.  That same month, HCM initiated a reduction in force, terminating and/or eliminating 20% of its workforce, and sent letters to its lenders informing them that it would be winding down two Highland-managed hedge funds.  D56.1 ¶¶ 60-61.  During this period, CDO Fund was paying its creditors "[g]enerally from cash flows of assets that it owned."  Braner Tr. at 128-29.

In mid-October 2008, Citi itself issued a series of margin calls to CDO Fund, the last and operative of which was for approximately $17.6 million.  D56.1 ¶¶ 79-86.  In lieu of paying cash to meet the margin call, CDO Fund proposed that Citi accept a pledge of securities, and agreed on or around October 23, 2008, to post additional securities as collateral.  Id. ¶¶ 91, 96; P56.1 Ctr. Stmt. ¶ 96.  The selection of the assets to be pledged was the result of a negotiation between HCM "as the investment manager under contract to CDO Fund" and Citi, and reflected a

"collaborative effort between the counterparties." Leventon Tr. at 113-14.

CDO Fund's pledge of additional collateral was formally memorialized as part of an agreement entered into by Citi, HCM, and CDO Fund on November 25, 2008. D56.1 ¶ 102; P56.1 ¶ 63; Prudhomme Decl., Ex. B-11 (the "November 25 agreement"). In addition to Citi accepting CDO Fund's pledge, the parties agreed, inter alia, to the following: CDO Fund would pay down the Loan Facility by December 1, 2008; HCM would guarantee repayment of the Loan Facility; following termination of the Loan Facility, the collateral securing that facility would be retained by Citi to collateralize the CDS Transactions; and "Eligible Credit Support" would "otherwise be limited on an ongoing basis to cash only," id. ¶¶ 1, 2, 3, 9. The parties also agreed that the Independent Amount for the CDS Contracts would now be equal to $18,664,585. Id. ¶ 6.

## IV. __The December 2008 Margin Calls__

By December 2008, pursuant to the November 25 agreement, CDO Fund had posted over $18.7 million in cash and 34 securities to collateralize the CDS Transactions. P56.1 ¶ 28; D56.1 ¶¶ 106-08.

### A. The December 11 Margin Call

Following the November 25 agreement, Citi generated new marks on CDO Fund's collateral on December 9 or 10, 2008. D56.1 ¶ 117;

P56.1 Ctr. Stmt. ¶ 117.[4]  Prior to 10:00 a.m. on December 11, Citi issued a margin call to CDO Fund for $5.22 million.  D56.1 ¶ 119; P56.1 ¶ 74; Prudhomme Decl., Ex. B-24 (e-mail transmitting call).

Later that morning, Citi's Bejile, copying other Citi employees including Clements, e-mailed HCM's Roos stating, "As requested, I have attached our equity marks that were used for today's margin call."  McCallum Decl., Ex. 57.  He attached a spreadsheet containing marks for CDO Fund's collateral securities and a "Highland Balance Sheet" listing $53,782,684 in "Assets," broken into CDO Fund's cash and noncash collateral, and $59,000,000 in "Liabilities," broken into $18,664,585 of initial margin and $43,852,059 of Exposure.[5]  Id.  Two hours later, Roos responded:

> Brian,
>
> Irrespective of the marks on the cash securities (we can discuss this further), you are ascribing a value of zero to the CDS.  The CDS positions have not defaulted and are still cash-flowing, therefore there should be some value attributed to them.

Prudhomme Decl., Ex. B-47.  After about twenty minutes, Bejile e-mailed back:

---

[4] While internal Citi e-mails dated December 2, 4, and 5, 2008, contain marks on CDO Fund's collateral, the marks therein were exactly the same as in the November 25 agreement.  See Prudhomme Decl., Exs. B-16 (December 2); C-2 (December 4); B-23 (December 5); B-11 at Ex. B (November 25 agreement).

[5] The two components of "Liabilities" sum up to more than the total, but Citi's greatest potential exposure was $59 million, the notional value of the CDS Transactions, P56.1 ¶ 82 & n.103.

> Actually there is value being attributed to the CDS. Remember, its [sic] being marked at 43MM on a 59MM notional. The difference there is the initial margin, which exists on all CDS trades.

Bejile Decl., Ex. 5.  There is no evidence that Roos responded to that e-mail or spoke to Bejile that day.  Later that afternoon, Roos did e-mail Clements with the subject "Pls call me" and no other text, to which Clements responded "I'm working on the case as we speak.  Let me call you soon."  McCallum Decl., Ex. 67.  Roos replied "Thank you."  Id.  CDO Fund did not pay Citi in response to the December 11 margin call.

On the morning of Friday, December 12, Citi issued a margin call for approximately $5.2 million to CDO Fund.  See Prudhomme Decl., Ex. B-25 (e-mail transmitting call).  Roos again responded to Clements' e-mail wherein Clements had promised to call him: "Just trying to stay in front of you on this . . . let me know what we can do."  McCallum Decl., Ex. 69 (ellipses in original).

B.  The December 15 Margin Call

Later on December 12, 2008, Citi issued a margin call to CDO Fund for $20.144 million.  P56.1 ¶ 79.[6]  Because the call was issued after 10:00 am, CDO Fund was not required to meet it until

---

[6] The parties dispute Citi's justification for the increase in amount.  As we find CDO Fund to be precluded from bringing its claim based on Citi's calculation of the margin calls, we do not address the parties' arguments on this issue.

the next business day.   Prior to 10:00 a.m. on Monday, December 15, Citi reissued the call.  D56.1 ¶ 122.

That morning, Roos e-mailed Citi, "Please send me the detail behind the margin call.  Is 20m right?"  Prudhomme Decl., Ex. B-53.[7]   Another individual from HCM responded to Citi's e-mail transmitting the margin call: "Please provide detail for this call."  Id. Ex. B-56.   Later that day, Bejile e-mailed Roos and Mahmud a spreadsheet containing the marks on CDO Fund's collateral used to generate the December 15 margin call, stating, "Gibran/Paul, Lets discuss when you receive these."  Id. Ex. B-57.  Although Citi continued to reissue a margin call to CDO Fund of approximately $20 million each business day through December 24, 2008, it did not mark down the collateral after December 15. P56.1 Ctr. Stmt. ¶ 284; D56.1 ¶ 123.

**V.    CDO Fund Fails to Meet Payment Demands of Other Counterparties**

Around this time in December 2008, CDO Fund was in discussions concerning demands for payment related to financing transactions with other counterparties.   On or around December 9, CDO Fund received a demand from Credit Suisse (or "CS") for payment in

---

[7] It appears Roos attempted to call Clements before he sent the e-mail.  See Prudhomme Decl., Ex. B-52 (December 15 internal Citi e-mail to Clements with subject "Missed call – paul from highland" stating "Re: $20mm margin call received today").

connection with the unwinding of a CDS transaction.  D56.1 ¶ 71.
In a December 12 e-mail to CS concerning CDO Fund's outstanding
balance pursuant to that transaction, Highland's CFO wrote:

> As you know, the CDO fund invests in highly illiquid assets.
> At this point in time, the fund does not have the liquidity
> to send CS the $1 mm.  We will send to you the money as soon
> as we can.

McCallum Decl., Ex. 11 at CDO00037198; see Braner Tr. at 303
(Highland's 30(b)(6) witness testifying that he had no reason to
believe the statement contained in the CFO's e-mail was untrue);
Roos Tr. at 178 (testifying that he did not find it surprising
that CDO Fund did not have the liquidity to make a $1 million
payment because "the asset class the CDO Fund invested in was very
illiquid").  On December 16, CS asked Highland to confirm that CDO
Fund "currently" had no unencumbered cash and only two unencumbered
assets, both of which were potentially pledgable as collateral to
CS.  D56.1 ¶ 182.

By December 15, 2008, CDO Fund's records reflected an
unrealized loss of $324 million with respect to the collateral it
had posted to its various counterparties.  Id. ¶ 73.  On or around
that date, Highland had discussions with CDO Fund's investors
concerning the possibility of a capital contribution, but the
contribution was ultimately not realized.  Id. ¶ 74.

-19-

On or around December 19, UBS demanded payment from CDO Fund for approximately $4.9 million, and after CDO Fund did not meet the demand, UBS subsequently closed down its financing facility with CDO Fund and liquidated CDO Fund's collateral pledged under that facility.  Id. ¶¶ 75-76.  Similarly, on or around December 23, Highland had negotiations with Natixis regarding the possibility of reorganizing CDO Fund's financing; the two sides were unable to reach an agreement, and Natixis ultimately seized and sold the collateral pledged to it by CDO Fund.  Id. ¶¶ 77-78.

## VI.   The Standstill Agreement and the Default

On or around December 15, 2008, Citi and Highland had discussions concerning possible resolutions to the outstanding $20.1 million margin call.  D56.1 ¶ 178; see McCallum Decl., Ex. 13 (December 16, 2008 internal Highland e-mail from Mahmud stating "I spoke with Clements last night and he and I discussed 3 or 4 possible solutions.  I need to walk Jim [Dondero] through those when he is free to decide what we want to go back to them with and how to move forward").  Highland proposed to Citi that it would pledge two additional pieces of collateral—the only unencumbered assets held by CDO Fund that had any material value.  D56.1 ¶ 181.  Citi and Highland also discussed HCM providing a guarantee for

cash flows from CDO Fund's collateral and CDO Fund receiving a margin call holiday through February 5, 2009.  Id. ¶ 183.[8]

On December 22, Citi sent Highland a draft of a standstill agreement.  Id. ¶ 184.  The draft agreement provided, inter alia, that CDO Fund would pledge the two unencumbered assets with material value as additional collateral; HCM would guarantee distributions on the existing collateral on or before February 5, 2009, up to $10 million; and Citi would provide CDO Fund with a margin call holiday through February 5, 2009.  Id. ¶ 185.[9]

On the morning of December 24, 2008, Mahmud e-mailed Clements to inform him that, given recent downgrades issued by ratings agencies on CLO tranches and the loans underlying those CLOs, the terms of the standstill agreement were no longer practical for HCM and CDO Fund.  Id. ¶ 189.  The effect of the ratings downgrades was to diminish the potential cash flow on CDO Fund's existing

---

[8] E-mails reflect discussions between Citi and Highland on December 19, 2008, related to a possible agreement.  See McCallum Supp. Decl., Exs. 43 (December 19, 2008 e-mail exchange between Roos and Clements); 44 (December 23, 2008 e-mail from Clements to Dondero, Roos, and Mahmud).

[9] While the draft agreement indicates that CDO Fund would post as additional collateral 267,000 shares of "HCF" with a market value of $1,575,300, McCallum Decl., Ex. 46 at CDO00028361, an e-mail sent from Clements to other Citi employees the week prior concerning his discussions with Highland referred to CDO Fund posting "279,452 shares of HCF . . . , market value $1.4MM," id. Ex. 14.  In both the draft agreement and the e-mail, the other additional collateral was CLO equity with a notional value of $16.25 million.  Id. Exs. 14, 41.  The draft agreement ascribed that asset a market value of $568,750.  Id. Ex. 46 at CDO00028361.

collateral, which HCM would have guaranteed under the agreement. Id. ¶¶ 190-91.  In the e-mail, Mahmud said CDO Fund would like to "explore terming out the financing by posting additional collateral," to which Clements responded, "what is the type and magnitude of collateral you have."  McCallum Decl., Ex. 47.  At that point, CDO Fund had "very little" in terms of cash or assets that were unencumbered and available to pledge.  D56.1 ¶ 194. Neither side has pointed to any evidence of anyone at Highland responding to Clements' query.  Later that day, Citi declared an event of default under the CDS Contracts because CDO Fund failed to satisfy its obligation under CSAA § 4(b) to timely meet the margin call.  P56.1 ¶ 97.

It is undisputed that by December 31, 2008, CDO Fund had liabilities that exceeded its assets.  P56.1 Ctr. Stmt. ¶ 54.  HCM ultimately announced a wind down of CDO Fund on February 4, 2009: its letter to CDO Fund investors stated that CDO Fund had "been rendered insolvent," and as of December 31, 2008, CDO Fund's liabilities to financing counterparties and other senior and trade creditors exceeded its assets to such a degree that no assets remained available to satisfy any unpaid redemptions or to distribute amounts to current investors.  McCallum Decl., Ex. 41.

## VII.  __The December BWIC__

On December 24, 2008, the day it declared a default, Citi announced a bids wanted in competition ("BWIC") on the assets comprising CDO Fund's collateral.  D56.1 ¶ 201; P56.1 Ctr. Stmt. ¶ 201.  A BWIC is an offer to sell securities to interested parties by inviting them to submit bids on those securities by a given time.  D56.1 ¶ 199.  Bids on the CDO Fund collateral were due by 10 a.m. on December 31, 2008.  Id. ¶ 201.

Citi sent the BWIC to various recipients at Bank of America, Barclays Capital, Calyon, Credit Suisse, Goldman Sachs, JPMorgan, Merrill Lynch, Morgan Stanley, Royal Bank of Scotland, UBS, Wachovia, and Deutsche Bank.  Id. ¶ 205.[10]  On December 29, Citi sent a Bloomberg message with the details of the BWIC to its internal salesforce and over 80 market participants.  Id. ¶ 206.[11]

---

[10] Citi cites to a December 24, 2008 e-mail stating that Citi had sent out "solicitations of bids/offers from the following recipients" and listing numerous e-mail addresses with the above banks' domain names, Bejile Decl., Ex. 14.  While it disputes Citi's statement that the BWIC was sent to the banks' "dealer trading desks" and notes that there is no transmission of the BWIC in Citi's e-mail itself, P56.1 Ctr. Stmt. ¶ 205, Highland does not assert that Citi failed to transmit the BWIC to these financial institutions, seven of which submitted bids in the BWIC, id. ¶ 209.

[11] Highland disputes Citi's statement that the Bloomberg message was sent to over 80 market participants including hedge funds and asset managers, contending that there is no identification of the recipients of the message as market participants, hedge funds, or asset managers.  P56.1 Ctr. Stmt. ¶ 206.  While Highland is correct that the message blind carbon copies a large number of individual recipients without identifying them by category of investor, the Court notes that many of the e-mail addresses copied on the message appear to contain domain names associated with well-known banks, asset managers, and hedge funds.  See Bejile Decl., Ex. 15 (e-mail addresses with domain names associated

Citi set reserve prices for each of the assets, meaning prices below which it would not sell to a third party.  Id. ¶ 211. However, Citi's secondary CDO trading desk was "interested in bidding on some of these positions in the auction, given the lack of liquidity and the likely low bids for the assets." P56.1 ¶ 106.

Citi received bids from Royal Bank of Scotland, Merrill Lynch, Morgan Stanley, Wachovia, Credit Suisse, JPMorgan, and Deutsche Bank.  D56.1 ¶ 209.  There were 68 bids in total, resulting in ten partial or full sales of the 34 assets.  Id. ¶ 210; P56.1 ¶ 107. Highland received notice of and had an opportunity to bid in the December BWIC.  D56.1 ¶ 214.   It bid on one of the assets, but its bid was below Citi's reserve price.  Id. ¶¶ 215-18.  Citi did not ultimately purchase any assets in the December BWIC, see Oral Arg. Tr. at 33, and any unsold collateral remained in Highland's account with Citi, D56.1 ¶ 213.

The total proceeds of the December BWIC were $2,518,355. Prudhomme Decl., Ex. B-62 at Citi-HL-00024111.001 (December 31, 2008 Citi e-mail listing proceeds).  After converting certain euro-denominated securities to United States dollars, Highland calculates the proceeds as $2,718,625.   P56.1 ¶ 109 & n.133.

---

with, for example, "JP MORGAN CHASE BANK," "APOLLO MANAGEMENT," "MAGNETAR CAPITAL," "BLACKSTONE GROUP."). Regardless, Highland does not seriously contend that the recipients were not "market participants" broadly speaking.

Relying on its expert's report, Highland contends that Citi received approximately $6.3 million less than a conservative fair market value, as of December 2008, for the assets sold. Id. ¶ 112.

## VIII.  **The March Auction**

Citi engaged Sanders Morris Harris Capital, Inc. ("SMH"), an investment bank and high net worth retail broker-dealer, to conduct a public auction of the remaining collateral on March 6, 2009. P56.1 ¶ 114; D56.1 ¶ 225. Ansel Eshelman, co-head of SMH's fixed income group, was principally responsible for conducting the auction. P56.1 ¶ 116. At the time of the March Auction, SMH had previously conducted between 12 and 24 auctions, either primarily or entirely on behalf of JPMorgan. Id. ¶ 121.[12]

At Citi's request, SMH advertised the March Auction in the Wall Street Journal ("WSJ") over three consecutive days. Id. ¶ 131; D56.1 ¶ 230. Eshelman testified that he had "represented other large banks and they haven't asked for anything to go into [the WSJ]." Eshelman Tr. at 144-45. SMH also circulated the

---

[12] The parties dispute whether SMH had conducted auctions on behalf of other entities. D56.1 Ctr. Stmt. ¶ 121. Eshelman's testimony suggests he may have had previous experience with BWICs for clients other than JPMorgan. See Eshelman Tr. at 132 ("Q. Before the auctions you conducted for JPMorgan, did you have any experience in conducting security liquidations? A. Not other than seeking liquidity or bids for institutional customers, but could have been on regular mortgage-backed securities or government agencies or any of those things. We bought and sold. And when we were selling for somebody, it was a bid-wanted and . . . I would source the street for the best bid.").

details of the March Auction to its own distribution list of more than 150 contacts.  P56.1 ¶ 231.[13]  According to Eshelman, he had "a large network of . . . associations with firms and people," and "people knew us and people knew me."  Eshelman Tr. at 24-25.

Highland and Citi dispute whether SMH made any efforts to contact the types of potential buyers who traded in the particular kind of security SMH was auctioning.  Eshelman testified that he did not remove or add certain contacts based on the type of asset being auctioned; instead, "over the time of developing this business and having people respond to these bids," SMH "built out or added to the list," and "kept them all in there."  Id. at 175-76.  With respect to the March Auction, he testified that his distribution list included "all the recognizable primary dealer names, all the regional dealers," as well as any others who SMH had come into contact with doing prior liquidations "that reached out to us."  Id. at 56-57.

The website Creditflux carried advance news of the March Auction, and in a March 4, 2009 e-mail responding to a question

---

[13]  While Highland disputes this statement of fact generally, it does not dispute that SMH circulated the details to SMH's distribution list of over 150 contacts, and thus we consider that fact undisputed.  See P56.1 Ctr. Stmt. ¶ 231 (disputing on grounds that Eshelman testified that SMH made no effort to contact buyers who traded in the type of security being sold and that the list included recipients who did not trade in that type of security); see also Fed. R. Civ. P. 56(e)(2).

about that article, Mahmud wrote, "These are the assets that Citi was financing in CDO Fund.  They margin called CDO Fund in December and the fund didn't have the cash to pay."  D56.1 ¶¶ 232-33.

Citi submitted bids, which functioned as implied reserve prices, but Citi's participation did not change the way SMH ran the auction.  Id. ¶¶ 236-38.  For each asset auctioned, SMH determined the winning bidder through a neutral, mechanical process, and Citi received no preferential treatment.  Id. ¶ 242.

During the auction, SMH received a total of 82 bids from six entities other than Citi.  Id. ¶ 239.  There were between two and six bidders (including Citi) for each of the 23 collateral assets. Id. ¶ 240.  In addition, JPMorgan submitted an all-or-nothing bid of $90,000 for all of the assets.  Id. ¶ 241.  Again, Highland received notice of and had the opportunity to bid in the auction. Id. ¶ 247.[14]  HCM bid on two pieces of collateral, purchasing one, with the other bid coming in lower than Citi's reserve price.  Id. ¶¶ 248-53.

Eight assets sold to third-party buyers for a total of $1,249,060.  P56.1 ¶¶ 133, 135.  Because Citi's reserve prices were higher than the bids obtained from third parties for 15 of

---

[14] HCM opened its account with SMH on behalf of Longhorn Credit Funding, LLC, which HCM manages largely for the pension fund manager Calpers.  P56.1 Ctr. Stmt. ¶¶ 248-50.

the 23 assets, those assets were not sold to third parties.  D56.1
¶ 244; see McCallum Decl., Ex. 35 (spreadsheet attached to March
6, 2009 e-mail from Eshelman to Bejile showing Citi as high bidder
for 15 of 23 listed assets).  Citi and Highland dispute whether
Citi "retained" or "acquired" the 15 assets at the reserve prices,
but Highland does not dispute that Citi moved the 15 assets from
Highland's account to Citi's secondary CDO trading desk's
inventory by the end of March 2009.  P56.1 Ctr. Stmt. ¶ 245.
Relying on its expert's report, Highland contends that Citi
received approximately $8.7 million less for the eight assets sold
to third parties than a conservative fair market value for those
assets as of December 15, 2008.  P56.1 ¶ 136.

IX.  **Procedural Background**

In April 2012, CDO Fund commenced this action asserting claims
for breach of contract, breach of the implied covenant of good
faith and fair dealing, violation of the UCC, and unjust
enrichment.  CDO Fund alleged that Citi, facing an existential
threat from the credit crisis and motivated to secure "cash any
way it could," "engineered a scheme, at the expense of CDO Fund,
to provide itself with an undeserved windfall."  Compl. ¶ 4.  More
specifically, CDO Fund claimed that Citi improperly marked down
assets comprising CDO Fund's collateral and calculated "inaccurate

margin calls based on the improper marks," so as to force CDO Fund to pay "millions of dollars in margin calls that it did not actually owe" and ultimately permit Citi to "seize assets at rock bottom prices and create a windfall for itself upon the inevitable market correction."  Id. ¶ 5.  With respect to the December margin calls, CDO Fund alleged that it "disputed" Citi's "dramatic mark downs" on its collateral and "requested specific details justifying the mark-downs from CITI" on December 11; that its "requests for back-up or support were essentially ignored by CITI"; and that it "continued to request support for the marks and margin call" between December 15 and 31.  Id. ¶¶ 32-35.  According to the complaint, Citi refused to revise or provide requested support for its calculations despite CDO Fund informing Citi of "higher levels on similar assets throughout the market," in addition to higher "third-party marks for the specific assets comprising" the collateral, and "insist[ing] that CITI revise its marks and margin requirements accordingly, or at least provide some justification" for them.  Id. ¶ 35.  With respect to the auctions of the collateral, CDO Fund asserted that Citi's "alleged efforts . . . to market the seized assets were nothing more than an elaborate sham designed to make it look like CITI was marketing assets when, in reality, it was placing itself in a position to retain these

assets." Id. ¶ 40. CDO Fund claimed that "CITI failed to market or offer the assets to typical industry players, essentially failing to even attempt to engage third parties," and that Citi only sold two assets via the auctions. Id.

In June 2012, Citi moved to dismiss, which motion we granted in part and denied in part. Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A., No. 12 CIV. 2827 (NRB), 2013 WL 1191895 (S.D.N.Y. Mar. 22, 2013) ("Highland"). CDO Fund's surviving claims were its breach-of-contract claim based on Citi's alleged failure to use good faith in determining the value of CDO Fund's collateral and the resultant declaration of an event of default and seizure of assets, and its UCC claim for Citi's alleged failure to sell the collateral in a commercially reasonable manner and to provide a post-sale accounting. Id. at *9-*11.

In May 2013, Citi answered and brought counterclaims against Highland, which Citi amended in July 2013, and of which two remain: (1) a claim for a termination payment based on CDO Fund's default on its obligations on the CDS Contracts; and (2) a claim for indemnification under the contracts governing the Loan Facility and the CDS Transactions. As to both counterclaims, Citi alleges that Highland GP and HCM are jointly and severally liable for the debts of CDO Fund.

-30-

After over two years of discovery, Citi has moved for judgment on CDO Fund's claims against Citi, and CDO Fund/Highland has moved for judgment on both CDO Fund's claims and Citi's counterclaims.

## DISCUSSION

### I. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when the pleadings and admissible evidence proffered to the court show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if a reasonable factfinder could decide in the nonmoving party's favor.  <u>Nabisco, Inc. v. Warner-Lambert Co.</u>, 220 F.3d 43, 45 (2d Cir. 2000).  It is generally "the movant's burden to show that no genuine factual dispute exists," <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244 (2d Cir. 2004).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  <u>CILP Assocs., L.P. v. Pricewaterhouse</u>

-31-

Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted); see Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc., 68 F. Supp. 3d 439, 466 (S.D.N.Y. 2014) ("Once the moving party has asserted facts showing that the non-movant's claims . . . cannot be sustained, the opposing party must set out specific facts showing a genuine issue for trial." (internal quotation marks omitted)).  At this stage, courts must resolve all ambiguities and draw all justifiable factual inferences in favor of the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When, as here, each side moves for summary judgment, we are "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011).  However, a party "may not survive summary judgment merely by conjuring a hypothetical issue of material fact." Robinson v. Concentra Health Servs., Inc., 781 F.3d 42, 44 (2d Cir. 2015).  The nonmovant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and ellipses omitted).

## II.   **The Dispute Resolution Provision**

Citi moves for summary judgment on CDO Fund's breach-of-contract claim on the ground that the failure of CDO Fund to unequivocally invoke the dispute resolution provision precludes it from now challenging the valuations supporting Citi's December 2008 margin calls.  We agree that no rational trier of fact could decide that CDO Fund provided Citi with sufficient notice that it was disputing the December 2008 margin calls under the CSA.

### A.   Legal Principles

New York State public policy favors the use and enforceability of alternative dispute resolution mechanisms between informed parties.  See Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 82 N.Y.2d 47, 53-54, 623 N.E.2d 531, 534 (1993); Ferguson Elec. Co. v. Kendal at Ithaca Inc., 274 A.D.2d 890, 891, 711 N.Y.S.2d 246, 249 (3d Dep't 2000).  Citing that policy, courts have found that a party's failure to invoke a CSA dispute resolution provision precludes the party from later challenging its counterparty's "request for additional collateral without having first vetted [its] claim in the manner agreed upon in the CDS Contract," VCG

*Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F. Supp. 2d 334, 343 (S.D.N.Y. 2008), aff'd, 355 F. App'x 507 (2d Cir. 2009); see *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 CIV 11078(LTS)(AJP), 2009 WL 2033048, at *7 (S.D.N.Y. July 13, 2009).  The New York Court of Appeals has similarly described the provision in mandatory terms, explaining that, prior to triggering its consultation and recalculation requirements, a disputing party "must" notify the other party of the dispute and "must" transfer the undisputed amount, if any, to the other party. *BDC Fin. L.L.C. v. Barclays Bank PLC*, 25 N.Y.3d 37, 40, 44, 29 N.E.3d 877, 878, 880 (2015).[15]

---

[15] Notably, earlier in that case, the Commercial Division of the New York State Supreme Court rejected the argument of plaintiff-counterclaim-defendant BDC that defendant-counterclaim-plaintiff Barclays's alleged improper calculation of margin calls issued to BDC provided a basis for BDC to terminate the parties' contracts where BDC did not "follow" the provision, holding that BDC, the margin-call recipient, "cannot now seek to avoid the CSA's requirements and retroactively challenge Barclays' calculation of its . . . collateral calls," *BDC Fin. L.L.C. v. Barclays Bank PLC*, No. 650375/2008, 2012 N.Y. Slip. Op. 33758(U), at *23-*24 (Sup. Ct. N.Y. County Aug. 15, 2012), aff'd as modified, 110 A.D.3d 582, 974 N.Y.S.2d 39 (1st Dep't 2013), aff'd as modified, 25 N.Y.3d 37, 29 N.E.3d 877 (2015).  On appeal in the First Department, both the majority and dissenting opinions agreed with that portion of the Commercial Division's ruling, see *BDC Fin. L.L.C. v. Barclays Bank PLC*, 110 A.D.3d at 585 n.2, 974 N.Y.S.2d at 42 n.2; id. at 593, 974 N.Y.S.2d at 48, and it was not discussed by the Court of Appeals.

The Court of Appeals decision instead focused on whether Barclays defaulted by failing to pay BDC's collateral call issued to Barclays.  While the Appellate Division granted BDC's motion for summary judgment on the basis that "the evidence in the record established as a matter of law that Barclays did not properly dispute the . . . collateral call because Barclays neither notified BDC of the dispute nor transferred the undisputed amount" by the next day, the Court of Appeals vacated the decision due to questions of fact regarding Barclays's compliance with the requirement to transfer the undisputed amount of the call, *BDC Fin.*, 25 N.Y.3d at 42, 44, 29 N.E.3d at 879, 881.  On the notice issue, the Court stated: "BDC does not deny that Barclays gave notice that it

Accordingly, a failure by CDO Fund to invoke the dispute resolution provision with respect to Citi's December 2008 margin calls would preclude its breach-of-contract claim. Highland does not suggest that CDO Fund was not subject to the provision, nor does it contend that CDO Fund may bring a claim based on Citi's calculations of the calls without having first invoked it. Instead, Highland contends that Citi itself breached the provision because it failed to recalculate its margin calls by seeking market quotes after CDO Fund "notified Citi that it was disputing the December 2008 margin calls through a number of telephone conversations and by email" and "timely consult[ed]" with Citi in an attempt to resolve the dispute.  CDP Fund Opp. Mem. at 11.[16]

---

disputed the collateral call.  Indeed, within hours of receiving the collateral call, Barclays emailed BDC stating that it did not agree with the call, and queried whether BDC wanted to invoke the dispute mechanism."  Id. at 44, 29 N.E.3d at 880 (emphases added).

[16] In our decision on Citi's motion to dismiss, we questioned how the no-waiver provision in the CSAA, see CSAA § 18(a), (c), interacted with other contractual provisions, including the dispute resolution provision, see Highland, 2013 WL 1191895, at *7 n.14 (noting that some courts had "suggested that a party's 'failure to provide notice pursuant to a contractual provision effectively abrogate[s] that contract's non-waiver provision'" (alteration in Highland) (quoting In re Arbitration Between Atherton & Online Video Network, Inc., 274 F. Supp. 2d 592, 595–96 (S.D.N.Y. 2003))).  In moving for summary judgment, Citi contends that enforcing the no-waiver clause here would vitiate the mandatory dispute resolution mechanism.  In response, Highland disclaims any reliance on the no-waiver clause to "excuse any alleged failure to invoke the dispute resolution provisions," focusing on the purported breach by Citi of its "subsequent obligations under those provisions."  CDO Fund Opp. Mem. at 17. Despite its assertion that it invoked the dispute resolution provision and that Citi did not thereafter perform the required recalculations, CDO Fund did not reference the provision in its complaint.  We already dismissed, on the basis that CDO Fund failed to set forth the relevant contractual provisions, claims based on Citi's alleged failure to "specify the nature of the potential

B.   <u>Application</u>

As set forth above, the dispute resolution provision required CDO Fund to "notify" Citi that it was disputing Citi's calculation of a margin call and transfer any undisputed amount to Citi by the close of the business day following the date of Citi's demand for additional collateral.  CSA ¶ 5.  The parties were then required to consult in an attempt to resolve the dispute by 1:00 p.m. on the business day following the date of the notice of dispute, and if they failed to resolve the dispute by then, Citi was to recalculate the margin call using the prescribed procedures.  Citi would then have to notify CDO Fund of its recalculated call by 10:00 a.m. the next business day.

In construing the provision, we have held that it "do[es] not require that the notice adhere to a particular form or means (<u>e.g.</u>, a written demand), nor that the notice formally reference the dispute resolution process."  <u>Highland</u>, 2013 WL 1191895, at *8.  Be that as it may, a party invoking it must still sufficiently communicate disagreement with the margin call such that the other

---

termination event or provide relevant information reasonably requested by CDO Fund" and to "provide any statement or other information to CDO Fund detailing any deficiency in any of the financing transactions."  <u>Highland</u>, 2013 WL 1191895, at *9 (internal quotation marks omitted).  Regardless, because we conclude Highland has not raised a genuine dispute with respect to CDO Fund triggering the dispute resolution provision, we need not address this aspect of CDO Fund's breach-of-contract claim.

party would have actual knowledge or reason to know that the dispute mechanism had been triggered.  See Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York, 269 F. Supp. 2d 424, 443 (S.D.N.Y. 2003) (discussing notice provision).

As both sides agree, the dispute resolution provision is designed to ensure a speedy process for resolving valuation differences underlying a margin call based on contemporaneous assessments of the complex instruments at issue.  See Oral Arg. Tr. at 42-43.  If CDO Fund's dispute was not readily apparent from its notification, Citi could not be expected to understand that CDO Fund was exercising its rights under the provision, nor could Citi be expected to initiate efforts to cure any deficiency within the tight deadlines imposed.  For similar reasons, if CDO Fund expressed dissatisfaction with an aspect of Citi's calculation of the margin call and Citi timely provided an explanatory response, it was CDO Fund's responsibility to make clear that it was maintaining its dispute.  Implicit in CDO Fund's obligation to engage in timely consultation with Citi to resolve the dispute was an obligation to inform Citi that its efforts to address CDO Fund's disagreement did not resolve the dispute; otherwise, Citi could not know whether the parties had reached a resolution or whether it had to recalculate the margin call, and it would again be

deprived of an opportunity to cure any deficiency in its calculation by the agreed-upon methods. Permitting a disputing party to preserve its rights to challenge a margin call based on equivocal language and conduct would thus risk depriving the nondisputing party of its contractual benefit of having such disputes resolved through consultation and a swift market check, as opposed to a battle of experts months or years after the fact. Keeping these principles in mind, we address Highland's contentions that the record shows that CDO Fund timely disputed the December margin calls by e-mail and by phone, and that Citi's internal e-mails demonstrate acknowledgement of a dispute.

   *i. Argument that CDO Fund Invoked the Provision in Writing*

   There is no contemporaneous written evidence of CDO Fund engaging in a dispute under the CSA. With respect to the December 15 margin call for approximately $20.1 million—the call that triggered the default leading to Citi's seizure of CDO Fund's collateral—Highland relies on CDO Fund's December 15 e-mails requesting that Citi "[p]lease provide detail for this call" and asking "[i]s 20m right," Prudhomme Decl., Exs. B-53, B-56. Neither e-mail indicates that CDO Fund was asserting that Citi's calculation of the margin call was wrong, and no reasonable factfinder could conclude that these requests for supporting

information put Citi on notice that CDO Fund triggered the dispute mechanism.  Moreover, later that day, Citi provided a spreadsheet setting forth the collateral marks used to generate the call, see id. Ex. B-57, and there is no evidence of CDO Fund subsequently disagreeing with either those marks or the margin call generally.

With respect to the December 11 margin call, only Roos's December 11 e-mail to Bejile communicated any disagreement with Citi's margin call.  As discussed above, Roos responded to Bejile's e-mail attaching the marks used for the December 11 margin call by taking issue with Citi's calculation of Citi's Exposure: "Irrespective of the marks on the cash securities (we can discuss this further), you are ascribing a value of zero to the CDS.  The CDS positions have not defaulted and are still cash-flowing, therefore there should be some value attributed to them."  Id. Ex. B-47.  However, CDO Fund cannot rely on this e-mail to show it engaged the dispute mechanism because, as Citi points out, Bejile responded shortly thereafter explaining that "[a]ctually there is value being attributed to the CDS" and that the CDS Transactions were "being marked at 43MM on a 59MM notional," with the "difference" reflecting the "initial margin, which exists on all CDS trades," Bejile Decl., Ex. 5; see P56.1 ¶¶ 33-34 (in determining "Delivery Amount," Citi was required to calculate the

-39-

excess of "Exposure on the CDS Transactions plus any Independent Amount" over the value of all posted credit support). Accordingly, Bejile explained that Citi was ascribing value to CDO Fund's CDS positions, but that the calculation of the margin call also accounted for agreed-upon initial margin, i.e., the Independent Amount. Highland does not argue that Bejile's response failed to address Roos's concern, and there is no evidence of Roos disagreeing with the response or requesting additional information concerning Citi's Exposure calculation. Absent any evidence of disagreement after its response, Citi was entitled to conclude that CDO Fund was not engaging the dispute resolution mechanism.

ii. *Argument that CDO Fund Invoked the Provision by Phone*

Lacking contemporaneous written evidence of a dispute, Highland suggests that evidence of discussions between the parties over the telephone demonstrates that CDO Fund disputed Citi's calculation. However, a factfinder would be required to speculate as to the contents of such conversations to conclude that CDO Fund met its burden to show it sufficiently notified Citi that it was disputing the calculation of the margin calls. That is inadequate to forestall summary judgment here, where the record renders such conjecture unsupported. See Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) ("As a [trier of fact] would be entitled

-40-

to review the evidence as a whole, courts must not view the evidence in piecemeal fashion in determining whether there is a trial-worthy issue.").

At the outset, Citi's submissions highlight at least two aspects of the summary judgment record that demonstrate the futility of relying on evidence of these phone conversations to create a genuine factual dispute. First, Roos and Mahmud, who the evidence shows may have had phone conversations with Citi concerning the December margin calls and the underlying marks on collateral, testified that they did not recall disputing the valuation of CDO Fund's collateral or invoking the dispute resolution provision. Specifically, while Mahmud testified that he thought "[g]enerally" "Highland" would have been disputing marks with "everybody" during the "fourth quarter" of 2008 because Highland thought "[t]he value[s] of the assets . . . were much higher" than its counterparties did, he had no recollection of the December margin calls; did not recall any discussions concerning such calls with Highland or Citi personnel; did not recall disputing any marks issued by Citi in or around December 2008; was unaware that there was a formal dispute resolution provision for disputing margin calls under the governing contracts and did not recall invoking it with respect to Citi during the relevant time

period.  Mahmud Tr. at 154-55.  Similarly, while Roos testified that "[e]very mark was almost always disputed, especially during this time frame," Roos Tr. at 246, he had no recollection of disputing marks used for the December 11 margin call or ever invoking the provision with Citi during the relevant time period, nor did he know whether he had ever invoked it or how one would do so, see id. at 168-69.

Second, as described in detail above, see supra pp. 12-14, 19-22, Citi has presented undisputed evidence that CDO Fund, facing substantial liquidity constraints in mid-December 2008, was not making cash payments to satisfy its outstanding obligations and was attempting to negotiate alternative resolutions with its counterparties.  For example, Highland's CFO informed Credit Suisse on December 12 in response to a December 9 demand that CDO Fund did not have the liquidity to send $1 million to Credit Suisse because it "invests in highly illiquid assets," D56.1 ¶¶ 71-72; Highland had unsuccessful discussions on or around December 15 with CDO Fund's investors concerning the possibility of a capital contribution; Credit Suisse asked Highland on December 16 to confirm that CDO Fund had "no unencumbered cash" and "only two unencumbered assets, both of which are potentially pledgable to [CS]," id. ¶ 182 (internal quotation marks omitted); CDO Fund did

not meet a December 19 demand for approximately $4.9 million related to its UBS financing facility and Highland entered into ultimately unsuccessful "negotiations with UBS for other options" to see "if there was any way we could work around terming out that facility similar to discussions we were having with other counterparties at the time," Braner Tr. at 369-70; and similar negotiations were held with Natixis on or around December 23.[17] Further, it is undisputed that as early as December 15, Citi and Highland themselves were discussing a potential resolution of the outstanding margin call; the two sides ultimately discussed a standstill agreement involving CDO Fund's pledge of additional collateral, HCM's guarantee of a certain amount of cash flows on CDO Fund's existing collateral, and a margin call holiday. When Mahmud informed Citi on December 24 that recent ratings downgrades meant the agreement was no longer practical for HCM and CDO Fund, he noted the prospect of "posting additional collateral," although

---

[17] Highland claims its CFO's e-mail to Credit Suisse concerning CDO Fund's inability to meet a $1 million demand was not accurate. P56.1 Ctr. Stmt. ¶ 72. Reviewing the e-mail, Dondero testified "[w]hat this just says, you have to take on its surface, is just negotiating with CS versus stating any accounting facts," but conceded he did not discuss with Highland's CFO "whether or not CDO Fund had liquidity to send a million dollars to [CS]." Dondero Tr. at 238-39. Even if we assume that Highland's CFO intentionally misrepresented CDO Fund's liquidity as a negotiation tactic, the e-mail is consistent with evidence of Highland engaging in talks with its counterparties to stave off demands on CDO Fund's limited funds.

"previously contemplated solutions involving additional monies or guarantees [we]re not possible." McCallum Decl., Ex. 47.

In light of the above, Highland's evidence of phone discussions between the parties does not create a triable issue. Highland points to the following as evidence of CDO Fund disputing the margin calls by phone: Bejile's December 11 e-mail to Roos attaching, "[a]s requested," Citi's marks used for that day's margin call, id. Ex. 57; Roos and Clements's later December 11 e-mail exchange, in which Roos e-mailed Clements stating "[p]ls call me," Clements responded he was "working on the case as we speak[,] [l]et me call you soon," and Roos followed up the next day stating "[j]ust trying to stay in front of you on this . . . let me know what we can do," id. Exs. 67, 69; and Bejile's December 15 e-mail to Roos and Mahmud, after Roos requested "detail behind the margin call," attaching Citi's marks used to generate the call and stating "[Mahmud]/[Roos], Lets discuss when you receive these," Prudhomme Decl., Exs. B-53, B-57.

We may infer based on these e-mails that Roos and/or Mahmud and Citi engaged in discussions concerning the December margin calls, but cannot speculate that during those discussions Roos or Mahmud invoked the dispute resolution provision. None of the e-mails refer to a dispute, much less a dispute with Citi's

-44-

calculation of the margin call.   Roos's and Mahmud's testimony
provides no basis to infer that either did such a thing.    In
contrast,  evidence  of  Highland's  engagement  with  CDO  Fund's
counterparties,  including  Citi,  to  find  alternatives  to  meeting
demands for payment provides an explanation for Highland and Citi's
phone calls that is factually supported.   Indeed, given CDO Fund's
financial  condition  and  the  size  of  Citi's  margin  calls,  Highland
had  every  reason  to  call  Citi  to  negotiate  a  workaround.    Thus,
even though Clements told Roos he was working on "the case," given
the  record,  a  conclusion  that  the  vague  and  unexplained  reference
was  specifically  to  a  calculation  dispute  would  be  unjustifiable.
See  Bickerstaff,  196  F.3d  at  448  (explaining  that  "'an  inference
is  not  a  suspicion  or  a  guess.  It  is  a  reasoned,  logical  decision
to  conclude  that  a  disputed  fact  exists  on  the  basis  of  another
fact  that  is  known  to  exist.'"  (brackets  omitted)  (quoting  1
Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01,
instr. 6-1 (1997))).[18]

---

[18] Highland also cites to the testimony of its 30(b)(6) witness Philip Braner.
Braner testified repeatedly that Highland disputed the margin calls, see Braner
Tr. at 283 ("I know in general we disputed the margin call. . . ."); 315
("[T]here was daily conversations with everyone involved . . . so I know that
there were discussions that occurred[,] I just can't recite to you exactly what
was going on in those conversations."), but, placed in context, his statements
are  conclusory  factual  assertions  that  cannot  raise  a  material  dispute  for
summary  judgment  purposes.   As  to  the  December  11  margin  call,  he  speculated
that  Highland  disputed  the  call  by  e-mail  or  by  phone.   See  id.  at  282-84  ("Q.
When  you  received  this  margin  call  of  $5.2  million  on  December  11,  what  did
Highland  do?  A.  I  believe  we  requested  support  from  Citi.  Q.  Okay.  Who  did

### iii.   Argument that Citi Acknowledged a Dispute

Finally, Highland argues that Citi's internal e-mails show that Citi did or should have acknowledged a dispute. Highland first relies on e-mails from Citi's Cross Product Margining Operations unit ("CPM") during the relevant time period. CPM distributed a daily "summary to highlight disputed calls / failed deliveries of margin collateral." Prudhomme Decl., Exs. B-35-44. On December 11, 2008, the summary listed the $5.22 million margin call to CDO Fund as "Unconfirmed," and another margin call to a

---

you request support from? A. It would have been documented in e-mails. We can review those. Q. I am asking you as the 30(b)(6) designated corporate representative . . . , who at Highland would have made the request for support? A. Again, it would have been documented in e-mails. I'm not sure the exact person that would have come from. Q. So you don't know? A. I know in general that we disputed the margin call, but I don't have specifics of where those e-mails came from. Q. How did you dispute the call? A. That's what I am saying. I would like to see generally in e-mails that we disputed the margin call. It could have been over the phone, it could have been by e-mail. I don't recall specifically on this date."). As to the December 15 margin call, he knew generally e-mails and phone calls disputing the call occurred, but could not recount any details of such e-mails or phone calls. See id. at 314-17 ("Q. So does Highland have any understanding of what was said in these phone calls that you are referencing? A. That's what I am saying, is there would have been phone calls disputing and e-mails disputing the $20 million. Q. Okay. Who would have been placing the phone calls? A. Again, that could have come from [Mahmud], [Roos], likely, to Citi. Q. Does Highland know that there were phone calls or is this a guess or an assumption? A. No, there was daily conversations with everyone involved, so, I mean, it happened every day, so I know that there were discussions that occurred. I just can't recite to you exactly what was going on in those conversations."); id. at 352-53 ("Q. Were there any discussions about these marks that Highland had with Citi between December 15 and December 31, 2008? A. Yeah, I believe we disputed the values they were using. . . . Q. Who were the personnel at Highland disputing those marks? A. Again, it was a constant conversation between [Mahmud] and Citi and [Roos] and Citi. Q. But there is no specific conversation that you can point to? A. No. We didn't pay the margin call and we—clearly I think if you look through the e-mails, we clearly disputed the marks that they were using for the collateral.").

-46-

different counterparty as "Disputed." <u>Id.</u> Ex. B-35.   A Citi presentation entitled "Derivatives Collateral and Margining Process" dated January 22, 2009, explained that the status of outgoing margin calls to a counterparty ("CP") was to be updated "with one of five statuses":

> [1] **Agreed**: CP agreed to call in full [; 2] **Partial Dispute**: CP agrees to a portion of the margin call [; 3] **Dispute**: CP disputes the full call amount [; 4] **Invalid**:  There is an issue caused by booking/economics, static data, coding of legal terms in Oasys that causes a margin call to be reflected incorrectly [; 5] **Unconfirmed**:  CP did not respond and could not be reached.

McCallum Decl., Ex. 70 at Citi-HL-00110784 (emphases in original). From December 11 to 24, the summaries listed margin calls to CDO Fund as "Unconfirmed," and margin calls to other counterparties as "Disputed" or "Agreed."   Prudhomme Decl., Exs. B-35-44.   In response to the December 11 summary listing CDO Fund as "Unconfirmed," a Citi employee asked, "Do you know on what grounds is Highland disputing the call?" <u>Id.</u> Ex. B-49.  Highland argues that because the only record evidence states that a designation of "Unconfirmed" means a counterparty "did not respond and could not be reached," and it is undisputed that Citi and Highland were having discussions during this period, it follows that Citi knew CDO Fund disputed the margin calls.   Highland further contends

-47-

that the question, "Do you know on what grounds is Highland disputing the call," indicates that Citi recognized a dispute.

We are not persuaded that these e-mails raise a triable issue. While the e-mails summarized "[t]oday's disputed margin calls / failed deliveries" of collateral, they included margin calls to other counterparties that were labeled (i) "Disputed," (ii) "Agreed and failed to pay," or (iii) "Agreed and paid" some amount less than the amount of the call, id. Exs. B-35-44, and Highland does not proffer any evidence of how the alleged inaccuracy in CDO Fund's contemporaneous "Unconfirmed" designation tends to show that the call was in fact "Disputed," another designation that was available to Citi. Highland's reliance on the employee's question is also unavailing: the question does not speak to Citi's knowledge of a dispute under the CSA—to the contrary, it self-evidently demonstrates a lack of knowledge on the part of its author, and there is no evidence suggesting communication between the author and Highland.

Finally, Highland contends that in disputing the December 2008 margin calls, CDO Fund followed the same procedure it used to dispute Citi's margin calls in October 2008, after which Citi had acknowledged a "dispute." The e-mails to which it cites to support this argument bear no resemblance to the evidence it relies on

with respect to the December margin calls.  In response to Citi's October 20 margin call, Roos e-mailed Citi that evening noting that the "marks look[ed] off" based on earlier marks Citi had sent CDO Fund, and followed up by, inter alia, pointing out specific marks that were "off," complaining that the "CDS marks seem punitive as well," and noting a specific CDS-related mark he thought was incorrect.  Id. Exs. B-9, B-10.  Roos's e-mails were forwarded internally by Citi, with Citi stating that "Highland disputed our margin call today and indicated the below issues." Id. Ex. B-9.  It is not clear that Citi understood CDO Fund to be invoking the CSA's dispute provision, but even inferring that it did, Roos's e-mails are unequivocal expressions of a dispute with Citi's calculation of the margin call.  Further, there is no indication, unlike with his December 11 e-mail taking issue with Citi's Exposure calculation, that Citi addressed Roos's complaints of error before characterizing them as disputes.  Accordingly, the October e-mails are not probative evidence of CDO Fund invoking the dispute mechanism two months later.

At oral argument, Highland confirmed that it had obtained all the factual deposition testimony it could and put forward its best case for its positions, and that the Highland and Citi e-mails discussed above were its strongest evidence of CDO Fund invoking

the dispute resolution provision.  See Oral Arg. Tr. at 3–8, 17–18.  Nevertheless, even with all justifiable factual inferences drawn in its favor, Highland has not put forward concrete evidence that CDO Fund adequately communicated its dispute with the December margin calls such that Citi would have known or have had reason to know that CDO Fund was following the agreed-upon procedure.  Accordingly, summary judgment is granted to Citi with respect to CDO Fund's breach claim.[19]

**III.**  **The UCC Claim**

Both sides move for summary judgment on CDO Fund's UCC claim.  Under Article 9, "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable."  N.Y. U.C.C. Law § 9–610(b).  A disposition is commercially reasonable if it is made: "(1) in the usual manner on any recognized market; (2) at the price current in any recognized market at the time of the disposition; or (3) otherwise in conformity with reasonable commercial practices among

---

[19]  It also bears noting that CDO Fund did not transfer any "undisputed amount" to Citi by the close of business on the day following Citi's issuance of the December 11 or 15 margin calls, as would be required under the CSA.  Highland now argues that it disputed the margin calls in their "entirety," e.g., Highland Mem. at 6, CDO Fund Opp. Mem. at 4, and thus was not required to transfer any amount to Citi.  Relying on its expert's report, Highland contends that Citi was actually over-collateralized in mid-December 2008, see P56.1 ¶ 180.  However, there is no evidence that Highland shared its views that Citi was over-collateralized with Citi contemporaneously.

dealers in the type of property that was the subject of the disposition." Id. § 9-627(b). Citi does not dispute that because Highland has put at issue the amount of Citi's alleged deficiency, it is ultimately Citi's burden to prove its disposition of collateral was commercially reasonable, see id. § 9-626(a)(2).

Commercial reasonableness hinges "on the totality of the circumstances, including the good faith efforts of the creditor." F.D.I.C. v. Wrapwell Corp., No. 93 CIV 859 (CSH), 2002 WL 14365, at *9 (S.D.N.Y. Jan. 3, 2002). In conducting its inquiry, a court should consider "accepted business practices" in the particular industry "as a guide to what is most likely to protect both debtor and creditor." Bankers Trust Co. v. J. V. Dowler & Co., 47 N.Y.2d 128, 134, 390 N.E.2d 766, 769 (1979). Highland does not contend that selling the CLO positions at issue through a BWIC or public auction failed to conform to practices of dealers of such assets, but takes issue with specific aspects of each sale.

A.   The December BWIC

While the undisputed evidence of seven sophisticated bidders participating and Citi's use of reserve prices to protect the collateral from being sold below certain levels suggests that Citi met its obligations, Highland has raised a material question of fact with respect to the December BWIC. Highland's argument is

-51-

principally that the timing of the BWIC, for which bids were due
December 31, 2008, rendered it commercially unreasonable.
According to Highland's expert, Daniel I. Castro, Jr., the December
BWIC was "poorly timed and poorly executed" because it was not
conducted "under normal business conditions when market
participants are fully staffed and have available balance sheet
and appetite to purchase securities." Prudhomme Decl., Ex. B-72
¶ 122. Citi responds that Castro's opinions are inadmissible
conjecture, as Castro had never been a trader at a broker-dealer
and was not trading CLO securities in December 2008, and further
that the opinions lack evidentiary support, as he failed to
identify any specific market participants who would have been less
likely to bid because of the date of the BWIC.

Citi is correct that "[a]n expert's opinions that are without
factual basis and are based on speculation or conjecture are . . .
inappropriate material for consideration on a motion for summary
judgment," Major League Baseball Props., Inc. v. Salvino, Inc.,
542 F.3d 290, 311 (2d Cir. 2008), and an expert may not give an
unsupported opinion merely because he has experience in a
particular field, see Fed. R. Evid. 702 advisory committee's note
(2000) (witness "relying solely or primarily on experience" must
"explain how that experience leads to the conclusion reached, why

that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts").

Here, Castro's opinions on the December BWIC were based on his "industry knowledge, experience, and expertise," Prudhomme Decl., Ex. B-72 ¶ 13.  Specifically, in his experience, on the last day of the year "most broker-dealers and investors are only partially staffed," "[m]any or most of the senior personnel take the day off, and typically a skeleton crew is in place to conduct any minor business that may come up"; moreover, "most buy-side (investment) firms close their books well before Christmas, year after year" and thus "most potential bidders for an auction held on the last day of the year would not have been able to participate" in the BWIC.  Id. ¶ 122.  Although Castro has provided scant detail to support these statements, given the straightforward nature of the proposition he is advancing, he has sufficient experience investing in and advising investments in structured financial products and consulting with traders at a broker-dealer to opine on market customs with respect to trading in such products on December 31.[20]  Despite his failure to name dealers or buy-side

_____

[20] In addition to other related employment, from 2005 through April 2008, Castro was managing director, chief credit officer, and a portfolio manager for the structured finance group at GSC Group, an investment management firm and asset manager that invested in, among other things, leveraged loans, RMBS, CMBS, ABS and other real estate structured products.  See Prudhomme Decl., Ex. B-72 ¶ 9. While at GSC, he helped manage two hedge funds investing in primarily CDO equity

firms that were poorly staffed or had closed their books the day of the BWIC, his opinions regarding common practices are still probative of the reasonableness of choosing that date.

Moreover, as Highland points out, Citi's secondary CDO trading desk was "interested in bidding on some of these positions in the auction, given the lack of liquidity and the likely low bids for the assets," P56.1 ¶ 106. While Citi may simply have been interested in bidding on the assets generally, construing the facts in the light most favorable to CDO Fund, Citi was enticed by the lack of liquidity and likely low bids on that specific date, suggesting that it was aware that the timing was not likely to enhance competitive bidding. While Citi is correct that it "was not bound to wait and undertake the risk of a declining market," Citibank, N.A. v. Solow, 92 A.D.3d 569, 569, 939 N.Y.S.2d 361, 362 (1st Dep't 2012), the record does not demonstrate one way or the other whether Citi risked inferior market conditions if it chose another date close in time. Accordingly, both sides' motions for summary judgment with respect to the December BWIC are denied.

---

and "illiquid/distressed ABS/MBS," respectively. Id. For the thirteen years prior, he was head of the structured finance research department at Merrill Lynch, where he "interacted extensively with Merrill Lynch's institutional-investor clients regarding sales, trading, and origination" of various products. Id. ¶ 10. While not a trader, he had a seat on the trading desk for the duration of his employment and the traders "often asked [his] advice," Castro Tr. at 40.

-54-

B.   <u>The March Auction</u>

In contrast, Citi is entitled to summary judgment on CDO Fund's UCC claim with respect to the March Auction.  Citi has put forward evidence demonstrating that it employed commercially reasonable procedures with respect to that sale.  As discussed, it is undisputed that Citi hired a third-party, SMH, to conduct the auction; SMH advertised the auction in the WSJ over three consecutive days, and circulated details of the auction to its own distribution list of more than 150 contacts; Citi submitted bids which functioned as implied reserve prices, thereby reducing CDO Fund's potential deficiency; Citi did not receive preferential treatment; SMH received a total of 82 bids on the 23 assets from six entities other than Citi, in addition to an all-or-nothing bid from JPMorgan; and Highland was notified of and did participate in the auction, although one of its two bids was lower than Citi's reserve price.  In response, Highland argues that SMH was an inexperienced and unqualified broker, chosen by Citi to ensure limited participation by true market players in an auction in which Citi would bid, so that Citi could secure the collateral at low-ball bids.  Highland further takes issue with SMH's solicitation of bids, emphasizing SMH's marketing methods and the ultimate number of bidders.  None of these arguments has merit.

With respect to SMH's qualifications, Highland contends that prior to the March Auction, SMH had conducted only 12-24 auctions, all for JPMorgan, that it had to ask JPMorgan for permission to conduct the auction for anyone else, and that SMH's procedures were developed by JPMorgan's attorneys.   While Citi disputes aspects of these assertions, see D56.1 Ctr. Stmt. ¶¶ 121, 124, 129, even if true, they are immaterial to the question of commercial reasonableness here.   It is undisputed that between January 2007 and the March Auction, SMH had liquidated over $10 billion in assets and had auctioned both CDO and CLO securities, including CDO and CLO equity.   D56.1 ¶ 227.   Highland does not explain why one to two dozen auctions on behalf of a large financial institution is an insufficient amount of experience as an auctioneer to attract participants, nor how JPMorgan's procedures failed to conform to commercially reasonable practices for liquidating the assets at issue.   Indeed, while Highland impugns SMH's qualifications to run an auction, it does not present any evidence of how SMH's alleged lack of experience or skill manifested itself when SMH conducted the "neutral, mechanical process" of determining winning bids, id. ¶ 242.

Instead, Highland's focus is on SMH's solicitation of bidders.   Highland argues that the WSJ was not a typical industry

source for securities auctions, but its argument is based entirely on Eshelman's testimony that other large banks Eshelman had represented had not asked "for anything to go into the Wall Street [Journal]," Eshelman Tr. at 144, and its 30(b)(6) witness's testimony that "typically" Highland itself does not "review the [WSJ] for auctions of assets," Braner Tr. at 418.  Neither statement indicates whether the WSJ was a typical industry source for securities auctions, or more generally, whether such advertising was unlikely to reach potential bidders.[21]  Cf. DeRosa v. Chase Manhattan Mortg. Corp., 10 A.D.3d 317, 321, 782 N.Y.S.2d 5, 9 (1st Dep't 2004) (choice of paper for publication of sale of real property "would not, by itself, make the sale commercially unreasonable").  Similarly, Highland relies on Eshelman's testimony that SMH included recipients on its contact list that did not trade in the specific type of security being offered, but does not dispute that SMH circulated details of the March Auction to more than 150 contacts, including "all the recognizable primary dealer names, all the regional dealers," as well as others who had

---

[21] Eshelman also testified that he no longer, in general, advertised auctions in the WSJ, but that he had done it in the past in connection with other liquidations; thought doing so helped attract bidders because "people who were involved in that market knew that these liquidation notices were out there"; and that SMH in general had "plenty of people" coming to them that had seen their notices in the WSJ, although he could not say if that happened with respect to the March Auction.  Eshelman Tr. at 144-47.

expressed an interest in liquidation auctions to SMH, D56.1 ¶ 231. Indeed, despite allegations that Citi "failed to market or offer the assets to typical industry players, essentially failing to even attempt to engage third parties," Compl. ¶ 40, Highland does not identify any industry participants that should have been included in the SMH Auction but were excluded, see D56.1 ¶ 234.

Highland relies on cases where courts considered a secured party's failure to market a yacht or heavy construction equipment to the most likely customer base as part of the totality of the circumstances demonstrating unreasonableness. See Comerica Bank v. Mann, 13 F. Supp. 3d 1262, 1289 (N.D. Ga. 2013) (commercially unreasonable sale of yacht where, inter alia, accepted offer was significantly lower than next lowest offer; facts suggested pressure from "aggressive and perhaps threatening buyer" to sell yacht at below-market price; marketing was not directed at European buyers despite yacht being built in "European style" and relative strength of European market at the time; and seller did not engage in a full direct marketing campaign); Gen. Elec. Credit Corp. v. Durante Bros. & Sons, 79 A.D.2d 509, 509-10, 433 N.Y.S.2d 574, 576 (1st Dep't 1980) (commercially unreasonable sale of "1975 model backhoe" where prospective bidders were not informed of features that "significantly" enhanced its value; method of advertising

violated the seller's own rules; newspaper selected was "clearly not the most appropriate one for reaching the intended market"; and seller rejected tentative offer "substantially in excess of the price ultimately received").  These cases are inapposite here, where the prospective bidders for the assets at issue would be sophisticated financial entities with the incentive and means to obtain information disseminated broadly through a national newspaper of wide circulation and to numerous market participants.[22]

Also without merit is CDO Fund's argument that the number of bidders—seven including Citi, in addition to an all-or-nothing bid from JPMorgan—is evidence of the March Auction's unreasonableness. To the extent that the number of bidders was low, which is far from clear, "[w]hen the sale is conducted so as to give a sufficiently broad group of buyers the opportunity to bid, their failure to respond in any particular number may itself be an indication of the market value of the item offered for sale," Bankers Trust, 47 N.Y.2d at 135-36, 390 N.E.2d at 770.  Ultimately, Highland's contention that SMH's procedures failed to notify sufficient potentially interested parties is based on speculation,

---

[22] It is also undisputed that the website Creditflux had a story on the March Auction in the days before it occurred and that HCM employees saw that coverage. See D56.1 ¶¶ 232-33.

and thus its argument that Citi designed the auction to be a sham also does not withstand scrutiny.  Because we find that the record establishes that the March Auction was conducted in a commercially reasonable manner, we grant Citi's motion for summary judgment on CDO Fund's UCC claim with respect to that sale.

## IV.  **Citi's Counterclaims**

Having found that CDO Fund cannot now challenge Citi's valuation of the December margin calls, it follows that Citi had the right to foreclose and liquidate the collateral and offset the proceeds against amounts owed by CDO Fund.  Citi has calculated a deficit of $24,110,175.72, based on its calculation of the fee payable to Citi to terminate the CDS Contracts and subtracting (i) fixed payments on the CDS Contracts in January, February, and March 2009; (ii) the proceeds of the December BWIC and March Auction; and (iii) the cash posted as initial margin on the CDS Transactions.  D56.1 Ctr. Stmt. ¶ 188.

However, Highland argues that Citi cannot meet its requirement to show the existence of damages with respect to CDO Fund's breach and otherwise disputes Citi's calculation of its deficit.  See Highland Mem. at 20-22.  We need not resolve at this juncture the issue of whether Citi's deficit calculation should include cash flows and sale proceeds for the collateral it seized

because there appear to be least two other open issues with respect to Citi's deficit calculation.  First, we have permitted CDO Fund's UCC claim to go forward with respect to the December BWIC, the resolution of which may affect the amount of the deficit.  Second, Highland contends that Citi's calculation failed to include cash flow distributions it received from CDO Fund's collateral prior to the March Auction.  See id. at 20.  While at oral argument, Citi suggested that it took those distributions into account, see Oral Arg. Tr. at 44, whether it did so is not clear from the proof submitted, see D56.1 Ctr. Stmt. ¶ 188 (Citi's calculation of the deficit amount).  Given that there are unresolved genuine issues with respect to the amount, if any, Citi is owed, the Court will not sua sponte enter summary judgment in favor of Citi on its first counterclaim.  Accordingly, it is also premature to rule on Citi's indemnification counterclaim, although Highland's only defense with respect to the indemnification claim under the CDS Contracts--that CDO Fund is not a "Defaulting Party" under the ISDA and thus is not subject to its indemnification provision—is foreclosed by the ruling on CDO Fund's breach-of-contract claim.[23]

---

[23] The ISDA provides that "[a] Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights" under the CDS Contracts.  ISDA § 11.  A "Defaulting Party" is a party with respect to which an Event of Default has occurred.  Id. §§ 6(a), 14.

## V.   HCM's Joint and Several Liability

Finally, Highland moves for summary judgment with respect to HCM's joint and several liability.   Highland's position is that HCM is not a limited partner in CDO Fund and Citi's amended counterclaims seek to impart joint and several liability based solely on HCM's status as such, <u>see</u> Am. Countercls. ¶¶ 84, 106 (alleging that HCM was a "Limited Partner of CDO Fund that took part in its day-to-day management and control, and the day-to-day management and control of the transactions at issue").   Citi responds that discovery has raised material questions of fact concerning whether CDO Fund, and its limited and general partners, were <u>alter egos</u> of HCM such that HCM is liable for CDO Fund's debts under a veil-piercing theory.   Both in its opening and reply briefs, Highland argues that Citi cannot press new theories of joint and several liability for the first time in opposition to summary judgment.

While a district court need not consider claims raised for the first time in opposition to summary judgment, "a district court may consider claims outside those raised in the pleadings so long as doing so does not cause prejudice." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 569 (2d Cir. 2000) (citing Fed. R. Civ. P. 15(b)). Here, we are not persuaded that Highland was prejudiced by Citi's

articulation of its veil-piercing arguments given the totality of
the circumstances.   Notably, Citi is not pressing a new claim:
under New York law,[24] "piercing the corporate veil does not
constitute an independent cause of action," but a "theory of
liability," First Keystone Consultants, Inc. v. Schlesinger Elec.
Contractors, Inc., 871 F. Supp. 2d 103, 124 (E.D.N.Y. 2012)
(internal quotation marks omitted); see Morris v. New York State
Dep't of Taxation & Fin., 82 N.Y.2d 135, 141, 623 N.E.2d 1157,
1160 (1993) ("[A]n attempt of a third party to pierce the corporate
veil does not constitute a cause of action independent of that
against the corporation; rather it is an assertion of facts and
circumstances which will persuade the court to impose the corporate
obligation on its owners.").   Moreover, Highland was not unfairly
surprised by Citi's arguments where Citi's amended counterclaims
made clear that Citi was seeking to hold HCM jointly and severally
liable; the relevant information related to the details of the
relationship between CDO Fund and HCM was in the possession of
Highland, not Citi; Citi sought in discovery information
concerning HCM's control of CDO Fund and transactions between CDO

---

[24] As discussed below, the parties dispute the law applicable to Citi's arguments
for piercing CDO Fund's veil, but we nonetheless consider it significant that
under the law of the forum state, Citi's veil-piercing theory would not
constitute an independent cause of action.

Fund and HCM, as well as between CDO Fund and other Highland-
related entities, in the fourth quarter of 2008, see D56.1 Ctr.
Stmt. ¶ 14, giving notice to Highland of the facts Citi would be
asserting to persuade the Court to impose liability on HCM; and
Highland's summary judgment opening brief addressed alternative
"avenues of liability" that Citi had failed to "properly allege[],"
including a veil-piercing theory under Bermuda law, Highland Mem.
at 23, 25.

Considering the veil-piercing theory on its merits, Citi's
arguments have raised potentially material factual issues with
respect to HCM and CDO Fund's relationship during the relevant
time period.  Citi points to evidence, see generally D56.1 Ctr.
Stmt. ¶ 14, suggesting that CDO Fund was under-capitalized in the
fall of 2008; that HCM personnel managed CDO Fund out of HCM's
office in Dallas; that HCM made multiple loans to CDO Fund,
totaling over $11 million, in October 2008, see McCallum Supp.
Decl., Ex. 48 RFA Responses Nos. 3, 8, 12, and 16, for which Citi
asserts there is no evidence of documentation, repayment, or
consideration; and that HCM guaranteed CDO Fund's repayment of the
Loan Facility, see November 25 agreement ¶ 2, with no evidence
that the guarantee was supported by consideration either, see
Braner Tr. at 256 ("I don't recall there being consideration.").

More importantly, Citi presents evidence that in September 2008, at HCM's direction, CDO Fund acquired approximately $47.7 million in notes issued by Highland Financial Partners, L.P. ("HFP," and the "HFP Notes"), a partnership managed by HCM, in exchange for 19 mezzanine tranches of CLO securities worth approximately $52.8 million, see Schedule A to HFP Note Purchase Agreement, dated September 26, 2008, McCallum Supp. Decl., Ex. 13 at Citi-HL-00009498.[25]  Less than four weeks later, CDO Fund pledged the HFP Notes to Citi as additional collateral to meet Citi's October margin call, see D56.1 ¶ 114; however, in January 2009, HCM announced to HFP investors that HFP's adjusted book value had fallen from "$5.78" to "$.07" during October 2008 and to "$0.00" the next month, McCallum Supp. Decl., Ex. 15 at Citi-HL-00014718.

Such evidence may be enough to raise a question of fact as to whether Citi can meet the two prongs of New York's veil-piercing analysis, assuming New York law were to apply.  As to the first prong, the facts above tend to show the existence of factors considered pertinent to whether HCM "exercised complete domination of [CDO Fund] in respect to the transaction attacked," Morris, 82

---

[25] According to the Note Purchase Agreement, CDO Fund transferred assets with a market value greater than the principal amount of the HFP Notes in exchange for HFP's forgiveness of a prior loan.  See McCallum Supp. Decl., Ex. 13 at Citi-HL-00009498.

N.Y.2d at 141, 623 N.E.2d at 1160, including whether HCM failed to deal with CDO Fund "at arms length" and treat CDO Fund as an "independent profit center[]," "the amount of business discretion" displayed by CDO Fund, and whether CDO Fund "had property that was used by other of the corporations as if it were its own," Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc., 933 F.2d 131, 139 (2d Cir. 1991). As to the second prong, whether the dominating party used its control over the dominated organization "to commit a fraud or wrong against the [claimant] which resulted in [claimant's] injury," Morris, 82 N.Y.2d at 141, 623 N.E.2d at 1160-61, courts have found it met where a "controlling party strips the assets from a previously legitimate corporation in order to avoid satisfying preexisting obligations that the corporation incurred in the ordinary course of business," Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc., 126 F. Supp. 3d 388, 2015 WL 5091113, at *13 (S.D.N.Y. 2015). Given that CDO Fund's acquisition of the HFP Notes predated Citi's October and December margin calls and that much of the evidence cited by Citi evinces an intent by HCM to sustain CDO Fund's viability by loaning it money in October 2008 and guaranteeing its obligations in November 2008, we are skeptical that Citi will be able to adequately link any inability

to collect its deficit from CDO Fund to affirmative acts taken by HCM pursuant to any domination of CDO Fund.

However, in light of our rejection of Highland's contention that Citi waived its veil-piercing arguments, the facts identified by Citi, and the inadequately developed record on this issue, we do not grant Highland judgment on HCM's liability.  We note that the record is incomplete with respect to two other issues material to the veil-piercing inquiry.  First, while the general rule is that the law of the state of incorporation of the entity subject to potential piercing determines when the liability shield will be disregarded, see Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995), when the entity at issue has no substantive contacts with its place of incorporation, there is support in New York case law for ignoring that jurisdiction and instead applying New York's choice-of-law "interest analysis" to determine the governing law, see Serio v. Ardra Ins., 304 A.D.2d 362, 362, 761 N.Y.S.2d 1, 1–2 (1st Dep't 2003) (defendant reinsurance company was incorporated in Bermuda but was not authorized to sell insurance there or to do business with Bermuda residents, was controlled from New York, and all transactions giving rise to the complaint occurred in New York); UBS Sec. LLC v. Highland Capital Mgmt., L.P., 924 N.Y.S.2d 312, 2011 WL 781481, at *3 (N.Y. Sup. Ct. 2011) (defendant was

incorporated in the Cayman Islands, but had no other "obvious ties" to that jurisdiction and the contracts at issue were negotiated in New York and governed by New York law), aff'd in part, modified in part, 93 A.D.3d 489, 940 N.Y.S.2d 74 (2012).  The current record says little about any contacts CDO Fund had with Bermuda other than being organized as an exempted limited partnership under its laws.  Second, Citi has indicated that all of its theories of HCM's liability depend on Citi piercing the separate legal identity of at least one Highland-related entity in addition to CDO Fund before reaching HCM.  See Oral Arg. Tr. at 45-46.  However, in its briefing, Citi has not pointed to any evidence in the record concerning those other entities that supports disregarding their legal forms.  Because these questions remain and Highland suggested that it wishes to retain an expert on this issue, we will permit limited additional discovery on veil-piercing, and Highland may renew its present motion directed to Citi's veil-piercing theory. If Highland and/or Citi wish to conduct additional discovery, the parties should confer and propose an expedited discovery schedule.

## CONCLUSION

For the foregoing reasons, we grant Citi's motion for summary judgment with respect to CDO Fund's breach-of-contract claim and

CDO Fund's UCC claim to the extent it is based on the March Auction;
deny the remainder of Citi's motion for summary judgment; and deny
CDO Fund/Highland's motion for summary judgment in its entirety.
The Clerk of the Court is respectfully directed to terminate the
motions pending at docket entries 88 and 119.

     **SO ORDERED.**

Dated:    New York, New York
         March 30, 2016

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE